549 A.2d 513

COMMONWEALTH of Pennsylvania, Appellee,

v.

Nicholas YARRIS, Appellant.

Supreme Court of Pennsylvania.

Argued April 11, 1988.

Decided Oct. 17, 1988.

Reargument Denied Dec. 2, 1988.

572

578

Joseph W. Bullen, III, Spiros E. Angelos, Media, for appellant.

John A. Reilly, Dist. Atty., Barry Gross, Dennis C. McAndrews, Asst. Dist. Attys., Robert A. Graci, Chief Deputy Atty. Gen., for appellee.

Before NIX, C.J., and LARSEN, FLAHERTY, McDERMOTT, ZAPPALA, PAPADAKOS and STOUT, JJ.

## OPINION OF THE COURT

FLAHERTY, Justice.

On July 1, 1982, after a trial by jury in the Court of Common Pleas of Delaware County, the appellant, Nicholas Yarris, was found guilty of kidnapping, rape, robbery, and murder of the first degree. In connection with the murder conviction, a separate sentencing hearing was held, as required by 42 Pa.C.S. § 9711, and appellant was sentenced to death. This direct appeal ensued.

## I. BACKGROUND

The incident from which the convictions arose was one in which a thirty-three year old woman was abducted, raped, and stabbed to death while on her way home from work. On December 15, 1981, at approximately 4:00 p.m., Mrs. Linda Craig departed from a shopping mall where she was employed as a salesperson. She did not arrive at home on time, and, shortly thereafter, her husband and another family member began to search for her. Police were soon notified of Mrs. Craig's disappearance, and Mrs. Craig's husband began riding with an officer in a patrol car to further the search efforts. The officer and Mr. Craig found Mrs. Craig's automobile, a light-colored Chrysler Cordoba with a brown landau roof, parked alongside a desolate roadway in Chichester, Pennsylvania. The automobile was not locked, and the keys were still inside. Mrs. Craig's pocketbook was on the passenger side, and the console was covered with traces of blood and hair. The next morning, a passerby found Mrs. Craig's severely beaten body, partially covered by fresh snow, lying in a pool of blood in a nearby church parking lot. The body was partially undressed, and was badly beaten and bruised all over. Six deep stab wounds had been inflicted into vital organs of the chest. Examination of the body and its clothing revealed that the victim had also been raped.

## II. PRETRIAL

The first pretrial issue is whether the Commonwealth impermissibly withheld from the defense materials which should have been disclosed during discovery. Appellant alleges that portions of various police reports were deleted from the photocopies which were turned over to his counsel, and that the deletions contained material which the Commonwealth was obligated to disclose.

We cannot accept this argument due to appellant's failure to refer to anything in the record which supports his claim that he received anything less than the full disclosure to which he was entitled under Pa.R.Crim.P. 305. At the

commencement of trial, defense counsel made no motion for further discovery or for court inspection of materials allegedly withheld, nor was any such claim raised in post-verdict motions. If, as alleged in appellant's brief, the Commonwealth withheld portions of police reports, it would be for the trial court, in the first instance, to entertain the question whether defense counsel was ineffective for failing to pursue access to the excised material. On the record certified to this Court on appeal, however, there is no support for the allegation that appellant did not receive full discovery under Rule 305.

■ The second pretrial issue is whether the trial court erred in denying appellant's request for a change of venue, or, alternatively, in denying his request for sequestration of the jury during the trial on the basis of the extensive and allegedly inflammatory publicity surrounding the murder and the trial. Appellant cites *Commonwealth v. Daugherty*, 493 Pa. 273, 426 A.2d 104 (1981) and *Commonwealth v. Sourbeer*, 492 Pa. 17, 422 A.2d 116 (1980), as authority for his assertion that the pervasive publicity denied him a fair trial and denial of a change of venue constitutes reversible error entitling him to a new trial. We perceive no merit in these contentions.

The authorities cited by appellant involved publicity so greatly exceeding the media coverage of this crime and appellant's trial that we see no basis to apply the holdings in those cases here. The record contains no evidence of extensive, pervasive, or inflammatory reporting which would have required a change of venue or sequestration of the jury; there is thus no justification for the conclusion that the trial judge's rulings on these questions constituted an abuse of discretion.

## III. TRIAL

■ In *Commonwealth v. Zettlemoyer*, 500 Pa. 16, 26 n. 3, 454 A.2d 937, 942 n. 3 (1982), cert. denied, 461 U.S. 970, 103 S.Ct. 2444, 77 L.Ed.2d 1327 (1983), we established that in each death penalty case this Court would determine

whether there was sufficient evidence to sustain the conviction for murder of the first degree. In the present case, the evidence of appellant's guilt is sufficiently strong as to leave no question that guilt has been established beyond a reasonable doubt. Further, we find no merit in appellant's contention that, if certain items of evidence were excluded from consideration as having been improperly admitted, the weight of the evidence would then be insufficient. As discussed infra, none of the evidence introduced at trial was improperly admitted.

The evidence linking appellant to the crime consisted of, inter alia, the following. Expert testimony established that the rape in question had occurred not more than three hours before the victim's death, and an analysis of body fluids revealed that the perpetrator had type AB or type B secretions. Such individuals constitute thirteen percent of the male population, and appellant was proven to be a type B secretor.

There was also testimony from one of the victim's co-workers, Natalie Barr, that on numerous occasions during the week prior to the crime, appellant had been lingering around the victim's sales booth at the shopping mall. Appellant exhibited suspicious behavior in the vicinity of the booth, repeatedly coming to the booth and asking the prices of the same merchandise over and over again. The victim had mentioned to her husband that a man was stalking her and staring at her near the booth. Also, Franklin Kaminski, a worker at an adjoining sales booth, testified that the victim had pointed out a man who had been staring strangely at her and scaring her, and the worker recognized appellant as being that man. Further, the Commonwealth introduced evidence that the victim bore a significant resemblance to appellant's former girlfriend, who had undergone a tumultuous and physically confrontational breakup with appellant during the week before the crime. An inference was created thereby regarding appellant's motive for focusing attention on the victim and for taking violent actions against her.

Three days after the crime, appellant demonstrated a suspiciously detailed knowledge of the crime when he visited the sales booth where the victim had been employed, mentioned the victim, and stated, "I heard that she was raped." At that time, details of the crime had not been released to the public, and the fact that the victim had been raped was not public knowledge.

In the following months, while appellant was being held in the maximum security section of a prison, awaiting trial on unrelated charges, he made a number of incriminating statements to prison officials and detectives. First, on January 12, 1982, he told Sergeant Murphy, who served as a corrections officer at the prison, and the prison warden that he knew the person responsible for the murder of the saleswoman at the shopping mall. Appellant said that he had taken the person to the mall, and that the person later told him of having murdered the saleswoman. Appellant made similar statements to detectives who were then summoned by the warden. He told detectives that the individual responsible for the crime was his "friend," James Brisbois, and that Brisbois admitted raping and stabbing the victim and abandoning the victim's car in Chichester, Pennsylvania. Appellant also said that Brisbois described the car as being a light tan Chrysler Cordoba with a brown landau roof. Law enforcement authorities had not previously released to the public any information about a rape or about the victim's car having a brown landau roof.

Detectives investigated appellant's story regarding the culpability of Brisbois, but found that it would have been physically impossible for Brisbois to have been at the crime scene at the relevant time, and, further, Brisbois consented to a blood test which established that he was not the person who had raped the victim. Detectives confronted appellant with this information on January 27, 1982, and, in response, appellant admitted that he had fabricated his earlier statements, and also recanted his earlier story that Brisbois was responsible for the crime. In addition, he told detectives that his relationship with a girlfriend had recently terminat-

ed, that he believed he should have killed her, and that he "wanted to destroy the whole world." A detective then asked several times whether appellant had killed the saleswoman from the shopping mall. After a brief period of silence, followed by an assertion by appellant that he never meant to kill anyone, the following question was posed: "Why did you do it? Why did you kill her?" Appellant replied, "Why do you think?" The detective responded, "I think you just snapped out," but appellant made no further reply and soon declined to continue the discussion, stating, "I've said too much already."

On February 1, 1982, appellant asked to speak to the corrections officer with whom he had previously discussed the case. He told the officer that he had lied to the detectives, and, when asked why he had not told the truth, appellant said, "But I can't. I'll incriminate myself." Nevertheless, appellant proceeded to tell the corrections officer that he and a "buddy" had abducted the woman from the shopping mall, and that, after appellant raped her, the buddy stabbed her to death. Prison officials then summoned detectives to interview appellant again.

Appellant told the detectives that he would like to tell them about the crime but expressed reservations about doing so. A detective said, "You didn't mean to do it, Nick. Things just got out of hand; didn't they?" Appellant replied, "Yeah, they did. They really just got out of hand." Declining to discuss the case further, appellant stated, "Anything that I would tell you would hurt me.... I don't want to tell you something that's going to put me in jail." Finally, appellant offered to tell everything he knew, but only if a plea bargain could be arranged.

While in prison, appellant spoke on numerous occasions to a fellow inmate, Charles Cataleno, and made certain highly incriminating statements to him. Aside from asking Cataleno various legal questions about the crime of murder, appellant became very emotional about the murder of the saleswoman from the shopping mall, and said, "If I had the chance again, I never would have killed her." He also

stated, "[T]hey found my blood in her vaginal area." Appellant then asked Cataleno whether such evidence was sufficient to support a conviction. Appellant expressed concern that all of his alibi witnesses would be forced to commit perjury on his behalf at trial, and urged Cataleno to join the ranks of those willing to testify falsely at trial to aid in his defense. He asked Cataleno to lie about conversations between Cataleno and the corrections officer with whom appellant had discussed the case. Finally, appellant told Cataleno that he was engaged in an attempt to blame someone else for the murder, because the individual to be blamed needed to be "paid back" for previous wrongful actions.

In summary, the present conviction was supported by scientific evidence linking appellant to the rape of the victim, testimony regarding appellant's behavior toward the victim in the week preceding the crime, and numerous incriminating statements made by appellant to various individuals. We are satisfied that this evidence was more than sufficient to support the jury's verdict of guilt.

■ The first allegation of trial error is that an important Commonwealth witness, a detective, should have been sequestered prior to his testimony regarding incriminating statements made to him by appellant. The detective was permitted to hear the testimony of Charles Cataleno, a fellow prisoner of appellant, who testified that appellant had made inculpatory statements to him during his pretrial incarceration. Appellant implies that the detective, upon hearing Cataleno's testimony, was likely to mold his own account to accord with that of the prisoner. This argument is totally without merit.

The record includes the extensive testimony of Detective Martin at appellant's preliminary hearing and suppression hearing regarding the inculpatory statements made by appellant. His trial testimony was consistent with his prior sworn testimony at the preliminary hearing and the suppression hearing. There is no substance to the suggestion that he did, or was likely to, alter his testimony to achieve

consistency with that of Cataleno. Accordingly, we hold that the trial judge was well within his discretion to deny appellant's request that Detective Martin be sequestered in order to prevent the fabrication of false testimony.

■ The second claim of trial error involves the admission of evidence of appellant's prior criminal convictions of robbery and theft to impeach his credibility. Appellant claims that proof of the convictions was more prejudicial than probative, in violation of this Court's holdings in *Commonwealth v. Bighum*, 452 Pa. 554, 307 A.2d 255 (1973) and *Commonwealth v. Roots*, 482 Pa. 33, 393 A.2d 364 (1978).

■ Although this issue was not presented to the trial court for determination, and the court thus did not rule on the admissibility of the criminal history under the test enunciated in *Roots, supra*, we deem it suitable to review the issue under the exception to the waiver doctrine set forth in *Commonwealth v. Zettlemoyer*, 500 Pa. at 16 n. 19, 454 A.2d at 937 n. 19, which limits application of the waiver doctrine in appeals of death sentences. *Roots* enumerated five factors which govern admissibility of prior convictions to impeach the credibility of a criminal defendant who testifies in his own behalf:

1) the degree to which the commission of the prior offense reflects upon the veracity of the defendant-witness; 2) the likelihood, in view of the nature and extent of the prior record, that it would have a greater tendency to smear the character of the defendant and suggest a propensity to commit the crime for which he stands charged, rather than provide a legitimate reason for discrediting him as an untruthful person; 3) the age and circumstances of the defendant; 4) the strength of the prosecution's case and the prosecution's need to resort to this evidence as compared with the availability to the defense of other witnesses through which its version of the events surrounding the incident can be presented; and 5) the existence of alternative means of attacking the defendant's credibility.

482 Pa. at 39–40, 393 A.2d at 367 (footnotes omitted). With the exception of the final factor, this test supports the admission of the convictions of robbery and theft. The offenses are crimen falsi bearing directly on honesty or truthfulness, and both were recent convictions. The offenses did not constitute appellant's entire criminal history, and evidence of the two convictions was not so extensive that it cast appellant's character in such a bad light as to impute a strong propensity towards criminal behavior. Moreover, although one of the crimes charged in this trial was robbery, far more attention was focused on the offenses of kidnapping, rape, and murder, so there was no strong connection between the criminal history and the crimes for which appellant was on trial. The age and circumstances of appellant did not present unusual or distinctive problems for the defense. The Commonwealth's case, while amply sufficient to sustain a conviction, cannot be characterized as overwhelming; the defense did not rely solely on appellant's testimony, but included the testimony of thirteen other witnesses, twenty-three exhibits, and stipulations. The defense, therefore, clearly possessed the means of presenting its version of the events through witnesses other than appellant. As to the fifth factor, the Commonwealth possessed, and used, limited alternative means of undermining the defendant's credibility such as his prior inconsistent inculpatory statements made to Cataleno and law enforcement officers. On balance, however, application of the *Roots* test justifies the trial court's discretionary decision to permit introduction of appellant's criminal record to impeach his credibility as a witness.[1]

1. Although we have analyzed the admissibility of appellant's prior crimes under *Bighum* and *Roots*, we note that subsequent to the filing of this appeal, we decided the case of *Commonwealth v. Randall*, 515 Pa. 410, 528 A.2d 1326 (1987). *Randall* permits the impeachment of a defendant by evidence of prior crimes if "the date of conviction or the last day of confinement is within ten years of the trial date." *Id.*, 515 Pa. at 415, 528 A.2d at 1329. Under this standard, appellant's prior convictions for robbery and theft, which occurred less than ten years prior to trial, would clearly be admissible.

■ The next claim of trial error is the assertion that the testimony of Theresa Kulp was improper as its prejudicial impact far outweighed its probative value. Miss Kulp was appellant's girlfriend until days before the murder when she broke up with him, angering and agitating him so greatly that he struck her.

The trial court correctly permitted the testimony of Miss Kulp, as it was relevant to the motive for the murder of Mrs. Craig, who bore a strong physical resemblance to Miss Kulp. The Commonwealth produced evidence of the physical similarity between the two women, suggesting that appellant attacked and murdered Mrs. Craig as an unfortunate substitute for Miss Kulp, so the evidence clearly bore on the issue of motive. Weighing the probative value against the prejudicial effect of challenged evidence is a function which is within the discretion of the trial court, and we do not regard the decision to admit Miss Kulp's testimony as an abuse of discretion.

■ Next, appellant objects to the relevance of scientific evidence that testing of blood and body fluids placed appellant in the approximately thirteen percent of the male population who might have raped the victim. The argument ignores the distinction between the relevancy and the weight of the evidence. The evidence at issue is clearly relevant—that is, it supports the inference that appellant committed the crime. To be relevant, evidence need not establish a *probability* that a defendant committed the crime, but only the *possibility* that he did. *See McCormick on Evidence* § 211 (2d ed. 1972). How much weight to accord the inference is a question solely for the trier of fact, and there was no error in the admission of the evidence.

■ Appellant next objects to the identification testimony of Franklin Kaminski, alleging that his identification at trial was the product of an impermissible one-on-one confrontation at the preliminary hearing when appellant was present in handcuffs and without counsel. Appellant claims that Mr. Kaminski had failed to make a positive identifica-

tion from a photographic array prior to the preliminary hearing. There is no merit to this contention.

Appellant's argument relies on *Commonwealth v. Bogan*, 482 Pa. 151, 393 A.2d 424 (1978), which held that, under circumstances similar to Mr. Kaminski's preliminary hearing confrontation with appellant, the witness's "pretrial identification of [the appellant] amounted to an impermissibly suggestive one-on-one confrontation in the absence of counsel since counsel was not aware that an identification was being made and, therefore, had no opportunity to cross-examine the witness...." *Id.*, 482 Pa. at 164, 393 A.2d at 431. Assuming, *arguendo*, that Mr. Kaminski's confrontation at appellant's preliminary hearing was impermissible, it does not follow that his in-court identification at appellant's trial should have been suppressed. If Mr. Kaminski's subsequent in-court identification was independently based on his observations of appellant with the victim at the mall, then the in-court identification is admissible. *Id.*

Mr. Kaminski's observation of appellant at the shopping mall while appellant was "gawking" at Mrs. Craig the day before he murdered her gave the witness ample opportunity to see appellant clearly in good light from a short distance and to reflect that "the way he looked, it was distinct, like he was looking right through you and it is just something you don't forget." Within days, he assisted a police artist in constructing a composite sketch of the suspect, and later tentatively identified appellant from a photographic array. When he saw appellant in person, he was positive that he was the man he had seen staring at Mrs. Craig in the mall. Mr. Kaminski's identification is akin to that of the witness in *Bogan, supra,* who had a lengthy, clear, and direct view of the suspect. *Bogan* permitted the in-court identification based on such an observation even though there had been an impermissibly suggestive confrontation between the time of the crime and the trial. Mr. Kaminski's identification is clearly distinguishable from that of another witness in the *Bogan* case, which was inadmissible due to the fact that the witness had had only a "side glance" at the assailant during

the crime, and shortly after the crime had stated unequivocally that he could not identify the assailant. We therefore hold that the trial court properly admitted Mr. Kaminski's in-court identification of appellant.

The next issue is whether appellant's statements to police and prison officers should have been suppressed, based on an alleged deprivation of counsel and *Miranda* warnings. Appellant's reliance on the case of *Commonwealth v. Chacko*, 500 Pa. 571, 459 A.2d 311 (1983), however, is unwarranted. *Chacko* held that if a prisoner is interrogated, the interrogation is "custodial" and *Miranda* warnings are required even if the prisoner is in custody on charges completely unrelated to the new investigation pursuant to which he is being questioned. *Chacko* also held that "interrogation" includes not only express questioning, but also "any words or actions on the part of the police ... that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Id.*, 500 Pa. at 579, 459 A.2d at 315. Appellant now seeks the suppression of statements he made to corrections officials and county detectives while imprisoned on charges unrelated to this case due to the officers' failure to read his *Miranda* rights before questioning him. *Chacko* entitles appellant to no relief: appellant initiated some of the discussions and, in those instances, the record does not support his contention that the officers, by word or deed, attempted to elicit incriminating responses from him; the other discussions, initiated by the officers, were preceded by *Miranda* warnings.

The interviews conducted by corrections officer Sergeant Murphy and by county detectives on January 12, January 27, and February 1, 1982, must be analyzed separately in order to determine whether any of them violated the holding in *Chacko*. On January 12, 1982, appellant requested an audience with Sergeant Murphy, indicating that he had information about the mall murder which would implicate an acquaintance of his. He told Sergeant Murphy that he gave a "guy" a ride to the mall and that the man later told him he had raped, stabbed, and killed a woman

who worked at a booth in the mall. Appellant repeated this information in more detail to county detectives later the same day, naming a "friend," James Brisbois, as the guilty party. At no time did Sergeant Murphy or the detectives interrogate appellant, who volunteered his accusations without being questioned, except for questions at the end of the session to clarify details of the account. The statement was on its face self-exculpatory, and in no way did the officers do or say anything constituting an attempt to elicit incriminating responses from appellant. Thus, the statements made to Sergeant Murphy and to county detectives on January 12, 1982, were permissible under *Chacko.*

The information volunteered by appellant on January 12 was routinely investigated, resulting in the conclusion that Brisbois could not possibly have been guilty of the offenses and that appellant must have fabricated the accusations. Due to the discrepancies revealed by the continuing murder investigation, appellant was summoned by the county detectives on January 27, 1982, for an interrogation which was preceded by *Miranda* warnings. At the interrogation, appellant repudiated his earlier statement, but refused to say anything further, so he was returned to jail. As appellant formally waived his rights under the *Miranda* decision prior to the interrogation, there was no violation of *Chacko.*

■ On February 1, 1982, appellant again requested to meet with Sergeant Murphy. Sergeant Murphy did not initiate the interview, nor did he question appellant in a fashion likely to elicit incriminating responses. Without solicitation, appellant said that his earlier statement was not completely truthful and then admitted participating in the rape though not in the murder, which he again said was committed solely by Jimmy Brisbois. The record reflects no violation of the holding in *Chacko*, as Sergeant Murphy did not question appellant in a way likely to elicit incriminating responses, and was surprised when appellant told him that he had raped the victim.

■ Following his interview with Sergeant Murphy on February 1, 1982, appellant was questioned by county detec-

tives. Before this interrogation began, the detectives again warned appellant of his rights under *Miranda,* and he again waived those rights. During this interrogation, he repeated that he had raped Mrs. Craig but denied stabbing her, and added other inculpatory details which were used against him at his trial. Appellant is not entitled to relief, as *Chacko* requires only that *Miranda* warnings be given prior to an interrogation under these circumstances, as they were.

■■■ Appellant also asks us to enlarge the protection of the *Chacko* case by adopting the rule of *People v. Bartolomeo,* 53 N.Y.2d 225, 423 N.E.2d 371, 440 N.Y.S.2d 894 (1981). *Bartolomeo* held:

> Where ... a suspect being questioned had been arrested ... on an unrelated charge, statements obtained in consequence of the interrogation must be suppressed if in fact the suspect is represented by an attorney with respect to the unrelated charge even though the fact of such representation is unknown to the officer. In such circumstances defendant cannot effectively waive his right to counsel unless the attorney is present.

53 N.Y.2d at 229, 423 N.E.2d at 373, 440 N.Y.S.2d at 896. If we were to adopt this rule, it would invalidate appellant's waiver of his right to counsel when he made incriminating statements to county detectives on January 27 and February 1, 1982, for he could not then validly waive the right to counsel unless the attorney was present.

We emphatically decline to add such a condition to the validation of a suspect's waiver of the right to counsel prior to a custodial interrogation. The fact that he is represented by an attorney in connection with unrelated charges may be a factor to evaluate in determining voluntariness of a *Miranda* waiver under the totality of the circumstances, but we do not hold that a suspect loses his competency to waive his right to counsel as soon as he obtains representation in an unrelated case. *See Commonwealth v. Rigler,* 488 Pa. 441, 449 n. 3, 412 A.2d 846, 850 n. 3 (1980) ("We decline to hold now that the mere fact counsel [representing

a suspect on the *same* charges which are the subject of the interrogation] has requested to be present with his client at interrogations prohibits the police from further interrogation in the absence of counsel, at the risk of invalidating as a matter of law any statements obtained at such counselless interrogations. That counsel had requested to be present during questioning is only one factor to consider among all attendant facts and circumstances pertaining to the giving of the statement, its voluntariness and the efficacy of the waiver of the defendant's rights.") Having decided in *Rigler* that a counselled defendant may make a valid uncounselled statement, we will not adopt the New York rule of *Bartolomeo* that a suspect cannot validly waive his right to counsel merely because he is represented by an attorney in an unrelated case.

■ The next issue raised by appellant is that the court allegedly erred in admitting the testimony of the medical examiner in connection with the cause of death and the time of intercourse. He claims that expert opinion testimony is disfavored, and was unnecessary in this case because he had stipulated to the cause of death. He also claims that the expert's opinion that intercourse may have occurred after the victim's death was without adequate foundation and should not have been admitted in evidence as it served only to inflame the passions of the jurors.

With regard to appellant's argument that the expert testimony of the medical examiner on the cause and manner of death should have been omitted due to his offer to enter a stipulation, he ignores the rule stated in *Commonwealth v. Stanley*, 498 Pa. 326, 336, 446 A.2d 583, 588 (1982), that the Commonwealth may prove its case with any proper evidence, "and *does not have to accept* the accused's stipulations." (Emphasis in original.) Appellant has not indicated what specific portion of the medical testimony was potentially inflammatory, and the testimony was clearly relevant to establish the elements of the crimes of murder and rape.

 As to the contention that the testimony that intercourse may have occurred after death was inflammatory, we observe that this opinion was expressed in response to a question of defense counsel. In general, a party may not object to improper testimony which he himself elicits. *Commonwealth v. McDuffie*, 476 Pa. 321, 324, 329, 382 A.2d 1191, 1192, 1194 (1978). Furthermore, we regard the testimony to be relevant to the issues before the jury and not to be sufficiently inflammatory as to be inadmissible on that account. The additional claim that the expert's opinion lacked a proper foundation is frivolous; the opinion was soundly based on medical facts properly admitted in evidence. We hold that the trial court did not abuse its discretion in permitting the testimony presented by the medical examiner.

 Appellant's final argument dealing with evidentiary issues is a challenge to the admission of photographs he claims were inflammatory, and unnecessary, due to his stipulation to the existence of what was depicted. He objects to photographs of the victim taken one year prior to her death on the basis that they were not relevant to his guilt or innocence and served merely to create sympathy for the victim and her family, violating the holding of *Commonwealth v. Story*, 476 Pa. 391, 383 A.2d 155 (1978) and *Commonwealth v. Lore*, 338 Pa.Super. 42, 487 A.2d 841 (1984). We hold that there was no error in the admission of the photographs.

The cases of *Story* and *Lore* are clearly distinguishable from this case. *Story* prohibited the use of pictures of the living victim *and his family* which served no purpose other than to create sympathy for the family. Likewise, *Lore* prohibited the use of photographs of the victim before his death when they had no relevance to any issue before the jury. In this case, by contrast, the Commonwealth was at pains to establish a motive for appellant's rape and murder of a stranger; its only explanation was that Mrs. Craig closely resembled Theresa Kulp, appellant's girlfriend who had broken up with him during the week before the murder.

In order to present this theory to the jury, it was necessary to produce photographs of the victim so the jurors could assess her likeness to that of Theresa Kulp, who testified at the trial. The photographs were admissible for this purpose, and the trial court did not violate our holding in *Commonwealth v. Story, supra.*

Next, appellant asserts that the prosecutor made improper arguments to the jury during his closing remarks. First, appellant argues that the following statement was improper because it was not supported by evidence of record: "[A]nd then he [appellant] comes into the Bellevue–Stratford where she [Theresa Kulp] is working and says 'I should kill you.' Now was he love sick? And you heard his mother say how his personality changed." Appellant correctly contends that there is no evidence of record that he told his girlfriend, "I should kill you." There is evidence, however, that appellant did harbor these feelings against his girlfriend. He told a detective: "I wanted to marry the bitch. I should have blown her f____ head off. After that, I just wanted to destroy the whole world."

Although · defense counsel objected to the prosecutor's statement and reminded the court of a sidebar ruling that testimony of threats made against appellant's former girlfriend would not come into evidence, the court overruled the objection, apparently having forgotten the earlier ruling. The following day, however, the court corrected its error and instructed the jury:

> There was a remark made in the closing with respect to death threats that were made to the girlfriend of the defendant by the defendant. In other words, Theresa Kulp did not testify about any death threats that were made to her. There were certain, there was a problem between them and certain things were exchanged and certain things were said but I do not recall her testifying that he threatened her with death.

Since there is no indication that the prosecutor's error was other than inadvertent, since the remark was supported in substance by other evidence of record, although it was an

improper summary of testimony, and since the court correctly instructed the jury that the prosecutor's summary of evidence was incorrect, we do not view the prosecutor's error as requiring a new trial.

■ Secondly, appellant claims that the prosecutor characterized him as "an animal." What the prosecutor actually said is: "He grabbed her and forced her into the car and took her and raped her and stabbed her and left her in that church parking lot by the woods like you would leave an animal." Plainly, the prosecutor characterized the body of the victim as being treated as one might wantonly treat the body of an animal. He did not characterize appellant as an animal. The claim is frivolous.

■ Finally, appellant asserts that the prosecutor improperly placed on appellant a burden to produce a witness by making the following statement: "[A]nd he talks about his good friend, Karen Palmer, and her family. Are they here? Have they been presented to you?" Appellant himself had testified that he spent December 18, 1981, with his "good friend" Karen Palmer and that he did not visit the shopping mall that day, although another witness, Natalie Barr, placed him at the mall on December 18 asking about the murder. The prosecutor's comment, therefore, was not improper, for it merely challenged appellant's failure to produce a witness who would have corroborated his testimony. *See Commonwealth v. Wright,* 444 Pa. 536, 282 A.2d 323 (1971).

■ Appellant next contends that there were errors in the court's instructions to the jury. The first of these is the claim that it was error to inform the jury, during the guilt phase, of the sentences applicable to first, second and third degree murder. The record indicates that the court did so inform the jury, but at the appellant's request, it also instructed the jury not to consider the penalties in its deliberation as to the degree of guilt. The 1978 death penalty statute, 42 Pa.C.S. § 9711, does not require that the jury be informed of the penalties for the various degrees of murder, as the earlier death penalty statute had, but it also

does not prohibit such an instruction. Since there is no indication that informing the jury of the various murder conviction penalties was unduly prejudicial, and because, to the contrary, knowledge of the severity of the penalties could serve only to caution a jury as to the seriousness of a conviction, the instruction was permissible.

■ Next, appellant claims that it was error not to instruct the jury that guilt must be proved "to a moral certainty." As this Court observed in *Commonwealth v. Banks*, 454 Pa. 401, 412, 311 A.2d 576, 581 (1973), there is no requirement that such a charge be made.

■ Appellant next asserts that it was error not to have charged the jury on the elements of involuntary manslaughter. In *Commonwealth v. Williams*, 490 Pa. 187, 190, 415 A.2d 403, 404 (1980) and *Commonwealth v. White*, 490 Pa. 179, 185, 415 A.2d 399, 402 (1980), this Court held that an involuntary manslaughter charge may be requested only "where the offense has been made an issue in the case and the trial evidence reasonably would support such a verdict." In this case there was no evidence to support a finding that the killing was involuntary manslaughter and appellant did not make this an issue in the case, claiming, instead, that he had not killed the victim. It was proper, therefore, to omit an instruction on involuntary manslaughter.

■ Next, appellant claims that the trial court erred in failing to instruct the jury adequately on the felonies underlying second degree murder. Specifically, the charges with respect to robbery and kidnapping are said to be defective. We have reviewed these instructions and find them sufficient. With respect to the robbery charge, appellant asserts that it was error for the court not to have defined "theft" as an element of robbery. "Theft" is commonly understood as stealing, and the court's recitation of theft as an element of the crime of robbery is adequate. With respect to kidnapping, the court's charge set out the elements of kidnapping, and was also sufficient. There is no merit in this claim.

■ The next assertion is that it was error to instruct the jury that a specific intent to kill could be inferred when a deadly weapon is intentionally used against a vital part of the body. The trial court charged the jury as follows: "If the defendant intentionally used a deadly weapon on a vital part of the victim's body, you may infer from this that the killing was intentional.... When a deadly weapon is intentionally used against a vital part of the human body, malice may be inferred to exist." Appellant's claim is the court should have instructed the jury that while an inference of malice or intent is permissible from the use of a deadly weapon on a vital part of the body, such an inference should not be drawn if there are circumstances which negate the inference. In this case, appellant kidnapped the victim, raped her, and stabbed her repeatedly. There are no circumstances in the case which negate the inference of malice.

■ Next appellant argues that it was error for the trial court not to charge the jury that the Commonwealth's witness Charles Cateleno, had an interest in the case. The court did charge as follows: "You should consider whether the witness testified frankly or fairly or whether he or she showed favoritism or bias in any way. *You should consider whether the witness has anything to gain or lose from the outcome of this case.*" (Emphasis added.) As to appellant, the court also instructed:

The defendant took the stand in this case as a witness. In considering the defendant's testimony, you are to follow the general instructions that I give you in judging the testimony of any witness. You should not disbelieve the defendant's testimony merely because he is the defendant. In weighing his testimony, however, you may consider the fact that he has a vital interest in the outcome of this trial. You may take the defendant's interest into account with all the other facts and circumstances bearing on credibility in making up your mind as to what weight his testimony deserves.

It is clear from this instruction that all witnesses are to be evaluated in terms of their favoritism or bias. The claim, therefore, is without merit.

■ Appellant next asserts that the trial court erred in its charge concerning identification. Specifically, the claim is that the trial court should have instructed the jury to accept the identification testimony with caution. The law in this area is expressed in *Commonwealth v. Kloiber:*

> Where the opportunity for positive identification is good and the witness is positive in his identification and his identification is not weakened by prior failure to identify, but remains, even after cross-examination, positive and unqualified, the testimony as to identification need not be received with caution....

378 Pa. 412, 424, 106 A.2d 820, 826 (1954). In this case two witnesses testified concerning appellant's presence in the mall both before and after the murder. One witness, Natalie Barr, who worked at the victim's sales booth, testified that appellant made certain comments to her about the murder and rape shortly after the crimes occurred. This witness positively identified appellant at trial as the man who had spoken to her, although at the preliminary hearing, she identified appellant but was not "positive." The other witness, Mr. Kaminski, identified appellant as the man the victim was afraid of and who had been staring at her at the mall. Like Ms. Barr, he positively identified appellant at trial, although he "had somewhat of a doubt" when, prior to trial, he had selected appellant's photograph from a photo array. He explained that the reason for his doubt was that appellant's appearance in the photograph was different than his appearance at the mall. In neither case did the witness *fail* to identify the appellant. It was not error, therefore, to omit a cautionary instruction as to witness identification, for there had been no prior failures to identify.

Appellant contends also that the trial court erred in failing to inform the jury that the jury's recollection of the testimony, not the testimony as recalled by the court, was controlling, and in summarizing the testimony of the identi-

fication witnesses in a one-sided manner. As to the first assertion, appellant is mistaken, for the trial court plainly instructed the jurors that they were to rely on their own recollection of the evidence.

■ The second claim, more precisely, is that when the court summarized the testimony of the identification witnesses, it failed to mention inconsistent aspects of their testimony. The court's summary of the testimony of these witnesses concerned the circumstances under which they saw the appellant. The court did not mention that the witnesses' positive in-court identifications had been preceded by earlier identifications which were less than positive.

In concentrating on what the witnesses stated on direct examination, the trial court did not, on the facts of this case, commit error, for in addition to summarizing when and where the witnesses saw the appellant, the court also instructed the jury that they should themselves determine whether they believed the identification witnesses. As the court instructed, the jury was to consider "under all the circumstances ... whether or not the identification was accurate." This would, of course, include the consideration that the earlier identifications had not been "positive."

Moreover, the court instructed the jury on identification testimony generally:

Because identifications can be mistaken, an individual can make a mistake as to identification even when the individual is trying to tell the truth. In determining whether or not to accept as accurate the identification testimony of Frank Kaminski and Natalie Barr, you must take into consideration the following factors. You should consider first whether the testimony of the identification witness is generally believable. Second, did the witness have the opportunity to observe and was that opportunity sufficient for the witness to make an accurate identification. You should consider how the witness arrived at the identification that the witness made, on what did they base it, what observations. You should consider all of the circumstances indicating whether or not the identification was accurate. You should consider whether the

identification testimony is supported by other evidence in the case.

Because the court fairly summarized the identification testimony and correctly instructed the jury as to how this evidence should be evaluated, its charge was not erroneous.

■ Finally, appellant raises a number of assertions of trial counsel's ineffectiveness. First, it is claimed that counsel was ineffective during voir dire for not questioning prospective jurors regarding their feelings about the fact that the victim in this case was a young mother. No argument has been proffered, however, to explain the relevance or importance of such an inquiry, and it does not appear that such an inquiry would have been within the proper scope of voir dire. *See Commonwealth v. England,* 474 Pa. 1, 7, 375 A.2d 1292, 1295 (1977) (voir dire should be confined to disclosing a juror's qualifications or lack thereof, as well as the question of whether the juror has formed a fixed opinion as to the accused's guilt or innocence); *Commonwealth v. Drew,* 500 Pa. 585, 589, 459 A.2d 318, 320 (1983) (voir dire is not to be used to ascertain a prospective juror's present impressions or attitudes about facts that may come to light in the trial of the case). Under these circumstances, counsel's actions in regard to voir dire cannot be regarded as deficient.

■ Next, appellant claims trial counsel failed to utilize medical or forensic specialists to assist in the preparation and presentation of a defense, and further claims that this constituted ineffectiveness in that it deprived appellant of an opportunity to present testimony which would have "critically evaluated" the scientific testimony adduced by the prosecution regarding bodily fluids and male secretor status pertinent to the rape. Appellant has failed to allege, however, that such specialists would have testified to any particular facts or opinions that would have been helpful to the defense. Also, the record reveals that defense counsel conducted a knowledgeable, thorough, and competent cross-examination of the prosecution's medical and forensic witnesses, thereby critically exploring the soundness of the prosecution's scientific evidence. In short, appellant has

failed to meet his burden of showing the likelihood of prejudice attributable to the manner in which defense counsel responded to the prosecution's scientific evidence. *See Commonwealth v. Clemmons,* 505 Pa. 356, 362, 479 A.2d 955, 958 (1984) (burden on defendant to show likelihood that prejudice arose from counsel's actions).[2]

## IV. DEATH SENTENCE

■■■ At the penalty stage of this proceeding, the jury found to be present the aggravating circumstance set forth in 42 Pa.C.S. § 9711(d)(6), to wit, that "defendant committed a killing while in the perpetration of a felony." The record in this case, discussed supra, makes it overwhelmingly clear that the murder committed by appellant occurred in the course of a kidnapping, robbery, and rape. There is no valid question, therefore, that the evidence establishes the relevant aggravating circumstance beyond reasonable doubt, and it certainly cannot be said that the evidence fails "to support the finding of an aggravating circumstance specified in subsection (d)." 42 Pa.C.S. § 9711(h)(3)(ii).

In returning a verdict of death, the jury rested its decision upon a finding of one aggravating circumstance which outweighed any mitigating circumstances. 42 Pa.C.S. § 9711(c)(1)(iv). The sentencing statute provides that, where aggravating circumstances outweigh mitigating circumstances, a verdict of death is required. *Id.*

Appellant has raised a number of issues pertaining to the validity of the sentence imposed, but none are of substance. Many of these issues involve contentions which are patently lacking in merit, or which have already been thoroughly addressed by this Court in other death penalty cases, and, hence, only brief discussion is warranted.

■■■ First, it is asserted that the death penalty cannot be imposed in cases where a conviction for murder of the first degree rests upon circumstantial evidence. Specifically, appellant contends that circumstantial evidence in itself

2. Inasmuch as we find no merit in appellant's claims of ineffectiveness, there is no need to address the Commonwealth's contention that the claims have become non-cognizable on appeal.

constitutes a overriding mitigating circumstance for purposes of the sentencing statute such that imposition of the death penalty is per se precluded. Such a contention is patently without basis, and finds no support in the sentencing statute. *See* 42 Pa.C.S. § 9711(e) (cognizable mitigating circumstances enumerated).

■ Next, appellant claims that it is improper for prospective jurors to be challenged for cause when they hold moral or religious beliefs that would substantially interfere with their ability to apply statutory provisions governing imposition of the death penalty. It is already well settled, however, that such jurors may indeed be properly challenged for cause. *Commonwealth v. Holland*, 518 Pa. 405, 543 A.2d 1068 (1988).

■ It is also asserted that, because the sentencing proceeding commenced in this case just eleven minutes after the jury convicted appellant of kidnapping, rape, robbery, and murder of the first degree, the jurors had no time for a respite in which to rid themselves of intense feelings about the case, and, thus, that the jurors may have been prone to favor imposition of the death penalty. There is no requirement, however, that jurors be given a period of relaxation between the guilt determination and penalty phases of trial. Further, determination of an appropriate penalty is not made the "product of passion, prejudice or any other arbitrary factor," 42 Pa.C.S. § 9711(h)(3)(i), by the mere fact that jurors have a fresh recollection of the facts of the case. The penalty phase of this trial began at 5:36 p.m., a reasonable hour, and concluded at 9:40 p.m. There is no basis in the record for belief that the proceedings were commenced or conducted with undue haste.

■ Appellant argues that 42 Pa.C.S. § 9711 is per se unconstitutional on grounds it restricts the province of the jury by providing for a mandatory sentence of death in certain factual contexts: where there is at least one aggravating circumstance and no mitigating circumstances are present, for example, or where aggravating circumstances outweigh mitigating circumstances. *See* 42 Pa.C.S. § 9711(c)(1)(iv). We have already considered and rejected

this argument. *Commonwealth v. DeHart,* 512 Pa. 235, 257–58, 516 A.2d 656, 667–68 (1986), cert. denied, —— U.S. ——, 107 S.Ct. 3241, 97 L.Ed.2d 746 (1987).

 Next, appellant claims that 42 Pa.C.S. § 9711 violates constitutional guarantees of due process in that it does not contain provisions requiring that formal notice be given to a defendant of the need to prepare for a capital case. Clearly, however, a defendant who is to be tried for murder of the first degree is statutorily on notice that, in an appropriate case, the death penalty may be imposed. *See* 42 Pa.C.S. § 9711(a). Further, where, as here, the case involves the obvious presence of statutorily enumerated aggravating circumstances, it is manifest that defense counsel must prepare the matter as a capital case. Also, appellant concedes that notice of the prosecution's intention to seek the death penalty in this case was given to defense counsel two weeks prior to trial. Under these circumstances, we perceive no violation of due process.

 Appellant further contends that trial counsel was ineffective at the penalty stage for not presenting expert psychiatric testimony in an effort to establish mitigating circumstances. Counsel presented the testimony of appellant, and of appellant's mother, at the penalty hearing, and this testimony did reveal appellant's history of mental and emotional problems. In addition, during the guilt determination phase of trial, the defense introduced through the testimony of various lay witnesses evidence of appellant's drug use, mental disorders, and suicide attempts. Appellant contends this constituted an inadequate attempt to prove as mitigating circumstances certain deficiencies in appellant's mental and emotional state. *See* 42 Pa.C.S. § 9711(e)(2), (3), (8) (mitigating circumstances). Pursuant to a remand order of this Court, an evidentiary hearing was held on this claim of ineffectiveness in January, 1987, and, subsequently, relief was denied by the court below. Examination of the record reveals that the denial of relief was proper.

 The primary aspect of this allegation of ineffectiveness is a claim that appellant's privately retained counsel

should have petitioned the trial court for appointment, free of cost, of a psychiatrist to examine appellant and to testify at the penalty hearing. However, as the court below properly noted in dismissing this claim, at the time of appellant's trial in 1982 indigent defendants in this Commonwealth were not constitutionally entitled to free assistance of court-appointed experts. *See Commonwealth v. Box*, 481 Pa. 62, 391 A.2d 1316 (1978). Indeed, it was not until three years after appellant's trial that the Supreme Court of the United States held that, in certain very limited circumstances, indigent defendants are entitled to have cost-free access to psychiatric experts. *Ake v. Oklahoma*, 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985). Counsel cannot be deemed ineffective for failure to predict changes in the law, *Commonwealth v. Garrity*, 509 Pa. 46, 55, 500 A.2d 1106, 1111 (1985), and, hence, defense counsel cannot be faulted for acting in accordance with the law as it existed at the time of trial.

Further, the evidentiary hearing revealed the types of psychiatric records and expert testimony that counsel allegedly should have presented at the penalty hearing. The court below properly determined, however, that appellant failed to meet his burden of establishing prejudice attributable to counsel's failure to present such evidence. *See Commonwealth v. Clemmons, supra.* Not only would such evidence have been to an extent repetitive of evidence of appellant's mental problems adduced from lay witnesses, but it may also have had a detrimental effect on the defense effort to avoid imposition of the death penalty in that it would have portrayed appellant as a highly dangerous person who would be likely to kill again. For example, the records and testimony included fear-inspiring descriptions of appellant as an "anti-social" person who "gains instant gratification" and suffers from "a severe personality disorder," and as one who is a "moderate to severe drug user." Under these circumstances, it cannot be said that there is a likelihood that prejudice accrued from the failure to introduce such evidence.

■ Finally, in accordance with our duty to review sentences of death from the standpoint of their proportionality to sentences imposed in similar cases, *Commonwealth v. Zettlemoyer*, 500 Pa. at 62, 454 A.2d at 961, we have reviewed the sentence imposed upon appellant in light of sentencing data compiled and monitored by the Administrative Office of Pennsylvania Courts. *See Commonwealth v. Frey*, 504 Pa. 428, 443, 475 A.2d 700, 707–08 (1984), cert. denied, 469 U.S. 963, 105 S.Ct. 360, 83 L.Ed.2d 296 (1984). Our review has focused upon cases where there was present the aggravating circumstance set forth in subsection (d)(6) (killing during the perpetration of a felony), and where not one but multiple other concurrent felonies were involved, or where rape or kidnapping were involved, such being the circumstances of the present case where the murder was accompanied by a kidnapping, rape, and robbery. Based upon the sentences imposed in those cases, no excess or disproportionality in the sentence imposed upon appellant is evident. Further, the record does not provide any basis for belief that the sentence imposed was the "product of passion, prejudice or any other arbitrary factor," 42 Pa.C.S. § 9711(h)(3)(i). Accordingly, the sentence must be affirmed.

Judgment of sentence affirmed.