J-S57014-15

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| MELVIN JACKSON | |
| Appellant | No. 2804 EDA 2014 |

Appeal from the Judgment of Sentence March 25, 2011
In the Court of Common Pleas of Philadelphia County
Criminal Division at No(s): CP-51-CR-0004208-2010

BEFORE:  MUNDY, J., OTT, J., and STABILE, J.

MEMORANDUM BY MUNDY, J.:                    **FILED OCTOBER 14, 2015**

Appellant, Melvin Jackson, appeals *nunc pro tunc* from the March 25, 2011 aggregate judgment of sentence of life imprisonment without the possibility of parole, imposed after he was found guilty of one count each of murder in the first degree, robbery, criminal conspiracy, and possession of an instrument of a crime (PIC).[1]  After careful review, we affirm.

The trial court summarized the relevant factual and procedural history of this case as follows.

> On January 20, 2009, [at] approximately 6:00 PM, Decedent, Dwayne Canty, resided with his mother, Nikisha Ramsey, in the 2100 block of Newkirk Street, Philadelphia, PA, and left home with the intentions of making a purchase at a neighborhood Kentucky Fried Chicken restaurant.

---

[1] 18 Pa.C.S.A. §§ 2502(a), 3701(a)(1)(i), 903(a), and 907(a), respectively.

Very shortly after leaving the house, Ramsey heard gunshots and she looked out of a window in search of her son. When she did not see him she got into her car and drove around the block toward the restaurant to find him. She soon observed a crowd outside an empty lot nearby and upon investigating the scene she found Decendent lying in the lot.

Philadelphia Police Officer Phil Sprague responded to the scene and observed Decedent lying on his back face up in the lot with his eyes open. Decedent was not breathing and he was nonresponsive. Sprague checked Decedent's outer garment pockets and found nothing, but he did observe an ID card, cell phone, and a hat, nearby. Decedent was transported to Temple University Hospital and was pronounced dead.

Dr. Gary Collins, Assistant Medical Examiner for the City of Philadelphia, testified that he performed a postmortem examination on the remains of the [D]ecedent[,] that the manner of death was homicide[,] and that the cause of death was multiple gunshot wounds. He stated that four gunshot wounds were located about the chest, upper torso and left thigh, and that two additional injuries were also consistent with gunshot injuries. Some of the bullets were recovered from Decedent's body and submitted to the Firearms Investigation Unit for analysis. Collins stated that he did not find any close or contact gunshot wounds and that the range of fire could have been anywhere from more than three feet to any further distance from the victim.

Philadelphia Police Officer Stephen Ahmie, an expert in firearms identification and assigned to the Police Firearms Identification Unit, testified that he examined the pieces of ballistics evidence submitted to him in connection with Decedent's murder. Ahmie examined a .38/.357 caliber bullet from Temple Hospital and two .38/.357 projectiles received from the Medical Examiner's Office. He determined that they were fired from the same firearm. He also examined two CBC .45 automatic-caliber fired

cartridge casings from the crime scene, and a .45 caliber bullet. Ahmie went on to opine that the bullets removed from the body of the decedent, the .38/.357 caliber, were fired from a revolver-type weapon. Further investigation led Ahmie to conclude that the two fired cartridge casings from the .45 caliber automatic matched a firearm that was recovered in an unrelated incident which occurred on March 7, 2009 and that the casings were fired from 2558 N. 17th Street, Philadelphia, PA and were found on the highway near that residence.

Philadelphia Police Officer Edward Fidler was assigned to the Crime Scene Unit on the day of the killing and he testified that he responded to the scene at the 2100 block of Newkirk Street, at Susquehanna Avenue and Newkirk Street, where he did a sketch of the area, took photographs, and itemized physical evidence found in the empty lot where [D]ecedent's body was found. Recovered from the scene was a cell phone, a Pennsylvania Identification Card in Decedent's name, fired cartridge cases from a semiautomatic handgun, and a black knit hat which belonged to [D]ecedent. The evidence was submitted to the Criminalistics Laboratory to be examined for the presence of hairs, fibers, and DNA. Fidler testified that he also [found] two CBC .45 caliber automatic fired cartridge cases and a copper/lead projectile.

Immediately prior to the killing, Monique Roane and her friend, Zakia Moseley, were returning home from a party and observed Appellant pass by upon arriving at the intersection of 29th Street and Susquenhanna [sic] Avenue. Mosely [sic] stopped to speak with another friend and while Roane waited for Moseley to conclude her conversation Roane observed Appellant run into the lot and saw him firing a handgun. After the shooting police arrived and Roane looked into the lot and observed Decedent lying there.

Roane's son was near the scene and he grabbed Roane, admonishing her to be quiet, and

quickly escorted her into the house. Roane testified that she did not immediately report her observations to police because she was afraid for herself and her son. The day before Decedent's funeral Roane and her son moved from their home. Roane testified that after Decedent's murder Appellant stalked and harassed her. She stated that Appellant interrogated her as to what she reported to police, and that Appellant told her neighbors that she was a 'snitch'.

Michael Strawther was in his grandmother's house in the 2900 block of Newkirk Street on January 20, 2009 when he heard gunshots. Strawther went out to investigate and he observed two males running by, one male was at the next corner of Diamond and Newkirk Streets, who he could not see sufficiently to identify, and the other male was half a block away, who he described to police as light complexioned and wearing a black jacket with a hood. Strawther testified that he had seen Appellant once before in the neighborhood but did not know him and did not know his name. Strawther further testified that after the shooting several friends in the neighborhood rushed to the hospital where [Decedent] was taken. He stated that he and Decedent worked together and they had been friends during the four years Decedent lived in the area. As the group was returning from the hospital, Strawther saw Appellant sitting on the steps leading to the home of Appellant's accomplice, Isaiah Lassiter.

On January 26, 2009[,] detectives met with Strawther and Roane at Roanes' [sic] home. They were shown a photograph of Appellant and his accomplice, Isaiah, and Strawther told detectives that he did not know Appellant but that he knew Isaiah. He also gave detectives a formal statement. Strawther met with detectives a second time on March 13, 2009 and supplemented his initial statement. At that time Strawther was shown a photo spread and positively identified Appellant. He explained that he did not tell police all he knew on the night of the shooting because he was not

- 4 -

thinking clearly, having just seen Decedent lying in the lot. He also did not know that Appellant was also known as "Prophe[c]y" but heard the name in the neighborhood after Decedent was killed. Upon being shown the photo spread with additional information regarding Appellant, Strawther identified Appellant as the person he saw on the night of shooting. Strawther also told dectectives [sic] that he knew Lassiter since they were young children and that he also positively identified Lassiter.

Several months after the shooting, and after Monique Roane and her son moved from their home located in the neighborhood where Decedent was killed, Appellant began calling her at her new home and having conversations with her son. Roane testified that [A]ppellant stalked and harassed her, interrogating her as to what she reported to the police and telling neighbors that she was a "snitch[.]" Roane went on to testified [sic] that on October 21, 2009 she was asleep in her bedroom when a sound woke her whereupon she observed Appellant crawl from beneath her bed and that he began to grab Roane by the throat and pushed her against the headboard of the bed. He called Roane a "snitch-a[**] b[**]ch" and threatened to kill her. Roane's eight year old daughter ran into the room and he threw the child back into her bedroom. Roane then began to fight Appellant and found an iron which she used to hit Appellant in the top of the head. Appellant was dazed and fell back onto the floor. He then got up and fled.

Police Officers Katie Lankford and Joseph Caruso testified [that they] responded to the report of a burglary in progress at Roane's home where [they] met with the Complainant who related that she was asleep in her bedroom and was awakened by Appellant who did not have permission to be in her home and that she chased him out of the house. Roane told the officer that Appellant was involved in [D]ecedents' [sic] killing in the 2100 block of Newkirk Street. The officers surveyed the area and [Officer] Caruso observed Appellant who was the

only person on the street and was standing across from 2543 Natrona Street. [Officer] Caruso asked Appellant what he was doing there and if he had any identification and when Appellant refused to respond and attempted to walk away, he was detained. [Officer] Lankford then accompanied the Roane[s] to the location [Officer] Caurso detained Appellant at which point R[oane] immediately identified Appellant as the person who was just inside her house without her permission and that he was involved in Decedent's murder.

Isaiah Lassiter, Appellant's accomplice, pled guilty to murder, robbery, and conspiracy in the case involving the killing of Dwayne Canty. Lassiter gave the police two statements. On April 29, 2009[,] Police Detectives McNamee and Manigold interviewed Lassiter and took his formal statement in which Lassiter stated that Appellant told him that he killed [D]ecedent. McNamee believed that Lassiter was himself involved in the shooting and he requested Detective James Pitts and his partner, Detective Cummings, to interview Lassiter again. Lassiter gave Pitts and Cummings an additional formal statement and again stated that Appellant shot Decedent. In his second statement Lassiter explained:

> "We were outside just chilling and we seen Dwayne. We were walking on the corner of Newkirk and Susquehanna. Dwayne came out of his house and was walking across the lot. I told Prophecy [Appellant], let's jam the boy. We went up to him. We both had guns and told the boy to give it up. Dwayne reached in his pockets and pulled out his money and gave it to me. That's when Prophecy shot him."

When he was asked how much money they took from [D]ecedent[,] Lassiter responded that they robbed him of approximately forty dollars ($40) which Appellant and Lassiter divided between them. Lassiter signed the statement and he positively

identified a photograph of Appellant as the person he referred to as Prophe[c]y.

Brandon Holiday, a privately retained investigator, testified for the defense that he conducted an investigation of the area of 29th Street and Susquehanna Avenue, and took several photographs and measurements. The photographs were published to the jury.

Trial Court Opinion, 1/20/15, at 2-7.

On April 13, 2010, the Commonwealth filed an information, charging Appellant with the above-listed offenses, plus one count each of firearms not to be carried without a license and carrying firearms in public in Philadelphia.[2] On March 16, 2011, Appellant proceeded to a jury trial, at the conclusion of which, on March 25, 2011, the jury found Appellant guilty of one count each of murder in the first degree, robbery, criminal conspiracy, and PIC while the two firearms offenses were *nolle prossed*. That same day, the trial court imposed an aggregate sentence of life imprisonment without the possibility of parole.[3] On March 30, 2011, Appellant filed a timely post-sentence motion, which the trial court denied on April 5, 2011. Appellant did not file a notice of appeal to this Court.

_____

[2] 18 Pa.C.S.A. §§ 6106(a)(1) and 6108, respectively.

[3] Specifically, the trial court imposed life without parole for first-degree murder, ten to twenty years' imprisonment each for the robbery and conspiracy charges, and two and one-half to five years' incarceration for PIC.

On May 20, 2011, Appellant filed a second, counseled post-sentence motion. Therein, counsel conceded his own ineffective assistance by not filing Appellant's notice of appeal due to a clerical error in his office. Appellant's Second Post-Sentence Motion, 5/20/11, at ¶¶ 5-11. The trial court treated the motion as a timely first petition for relief pursuant to the Post Conviction Relief Act (PCRA) and ordered the appointment of new counsel.[4] After many continuances spanning more than three years, on August 27, 2014, PCRA counsel filed an amended petition. On August 29, 2014, the trial court entered an order reinstating Appellant's direct appeal rights *nunc pro tunc*. On September 26, 2014, Appellant filed a timely notice of appeal.[5]

On appeal, Appellant raises the following two issues for our review.

I. Did the trial court commit error in refusing to give a [***Commonwealth v. Kloiber***, 106 A.2d 820 (Pa. 1954),] instruction to the jury with respect to the identification testimony of Monique Roane?

II. Did the trial court abuse its discretion in refusing to give a ***Kloiber*** instruction to the jury with respect to the identification testimony of Michael Strawthers that the jury must consider with caution the witness's identification of [Appellant]?

---

[4] 42 Pa.C.S.A. §§ 9541-9546.

[5] Appellant and the trial court have complied with Pennsylvania Rule of Appellate Procedure 1925.

Appellant's Brief at 7.

Both of Appellant's issues on appeal argue that the trial court erred in refusing to give his requested **Kloiber** instructions, pertaining to his identification by two witnesses. Appellant's Brief at 14-15, 19. We first address the Commonwealth's argument that Appellant has waived both of these issues on appeal because he did not object to the trial court's actual charge to the jury at trial. **See generally** Commonwealth's Brief at 10, 14.

Pennsylvania Rule of Criminal Procedure 647(B) states that "[n]o portions of the charge nor omissions from the charge may be assigned as error, unless specific objections are made thereto before the jury retires to deliberate." Pa.R.Crim.P. 647(B). Our Supreme Court has reiterated that Rule 647(B) is mandatory, such that "the mere submission and subsequent denial of proposed points for charge that are inconsistent with or omitted from the instructions actually given will not suffice to preserve an issue, absent a specific objection or exception to the charge or the trial court's ruling respecting the points." **Commonwealth v. Pressley**, 887 A.2d 220, 225 (Pa. 2005); **accord Commonwealth v. Janda**, 14 A.3d 147, 163 (Pa. Super. 2011); **Commonwealth v. Marquez**, 980 A.2d 145, 150-151 (Pa. Super. 2009), *appeal denied*, 987 A.2d 160 (Pa. 2009).

In this case, the certified record reveals that prior to the court giving its charge to the jury, Appellant requested the two **Kloiber** instructions. N.T., 3/22/11, at 152-153; N.T., 3/23/11, at 107-108. For Roane, Appellant

requested a standard **Kloiber** instruction, which the Commonwealth opposed. N.T., 3/22/11, at 153. For Strawthers, Appellant and the Commonwealth agreed that a **Kloiber** instruction was appropriate, but disagreed as to which standard jury instruction was proper for this case. **Id.** at 154; N.T., 3/23/11, at 108, 110-111. Appellant requested the first alternative instruction, whereas, the Commonwealth believed the second alternative was more appropriate. N.T., 3/23/11, at 109, 111; **see also generally** Pa. Sugg. Stan. Crim. Jury Instrs. § 4.07B (2015). The trial court refused to give any type of **Kloiber** instruction for Roane, and agreed with the Commonwealth that the second alternative instruction was proper for Strawthers. N.T., 3/22/11, at 153; N.T., 3/23/11, at 108; N.T., 3/24/11, at 103. After the trial court gave its charge to the jury, at no point in time did Appellant object to the trial court's actual charge as required by **Pressley** and Rule 647(B). Therefore, we agree with the Commonwealth that Appellant has waived both issues on appeal.[6] **See generally** Commonwealth's Brief at 10, 14.

---

[6] We note that Appellant actually requested the trial court clarify the second alternate **Kloiber** instruction for Strawthers after the trial court gave it to the jury. N.T., 3/24/11, at 150.

Based on the foregoing, we conclude both of Appellant's issues on appeal are waived under Rule 647(B) and **Pressley**.[7] Accordingly, the trial court's March 25, 2011 judgment of sentence is affirmed.

Judgment of sentence affirmed.

---

[7] Even if we were to conclude that Appellant's issues were not waived, we would conclude they lack merit. As to Roane, she testified that she knew Appellant, as he had stayed in her home and was a friend of her son's. N.T., 3/16/11, at 62-63. Our Supreme Court has held that "prior familiarity creates an independent basis for [a] witness's in-court identification of the defendant" rendering a **Kloiber** instruction unnecessary. **Commonwealth v. Ali**, 10 A.3d 282, 303 (Pa. 2010). Further, any alleged poor lighting in the area at the time Roane saw Appellant went to her credibility, not to whether a **Kloiber** instruction was required. **See generally Commonwealth v. Paolello**, 665 A.2d 439, 455 (Pa. 1995).

As to Strawthers, to the extent Appellant complains that the conditions under which Strawthers viewed Appellant were "less than optimal," this goes to Strawthers' credibility. **See id.** In addition, Appellant points out that Strawthers did not describe the perpetrator as having a beard, which Appellant does. Appellant's Brief at 19-20. However, a **Kloiber** instruction is not required where a witness "explained … the reason for his doubt was that [the defendant]'s appearance in the photograph was different than his appearance at the [scene]." **Commonwealth v. Yarris**, 549 A.2d 513, 528 (Pa. 1988). Here, Strawthers explained that the reason he did not mention Appellant having facial hair to the police was because Appellant's face was partially covered with a hood. N.T., 3/21/11, at 20, 55. Therefore, based on these considerations, even if we could address Appellant's claims on their merits, they would not garner him relief on appeal.

Judgment Entered.

_Joseph D. Seletyn_

Joseph D. Seletyn, Esq.
Prothonotary


Date: <u>10/14/2015</u>