14 A.3d 798

COMMONWEALTH of Pennsylvania, Appellee

v.

Anthony WRIGHT, Appellant.

Supreme Court of Pennsylvania.

Argued April 14, 2009.

Decided Feb. 23, 2011.

Sondra R. Rodrigues, Nina Morrison, Pro Hac Vice, for Anthony Wright.

Michael L. Banks, J. Gordon Cooney, Jr., Maria Gonzalez Calvet, Morgan Lewis & Bockius, L.L.P., Philadelphia, Nathalie Gilfoyle, for American Psychological Association.

Hugh J. Burns, Jr., Philadelphia District Attorney's Office, Peter Carr, for Commonwealth of Pennsylvania.

BEFORE: CASTILLE, C.J., SAYLOR, EAKIN, BAER, TODD, McCAFFERY, GREENSPAN, JJ.

## *OPINION*

Justice TODD.

This case presents the question of whether a convicted person who seeks court-ordered DNA testing under the "Postconviction DNA Testing Act," 42 Pa.C.S.A. § 9543.1, is precluded by his confession, which was ruled to be voluntary and admitted into evidence against him at trial, from establishing a *prima facie* case demonstrating that DNA testing would establish his actual innocence. After careful review, we conclude that a confession, even if previously and finally adjudicated as voluntary, does not constitute a *per se* bar to establishing a *prima facie* case, and the convicted person may, therefore, obtain DNA testing under Section 9543.1 if he or she meets all of this statute's pertinent requirements. Accordingly, we vacate the Superior Court's order and remand this case for further proceedings in accordance with this opinion.

The record reveals the following factual background in this matter. On Saturday, October 19, 1991, members of the Philadelphia Police Department went to the home of the

victim, Louise Talley, a 77–year–old widow who lived alone at 3959 Nice Street in Philadelphia, in order to check on her at the request of concerned family members who had been unable to contact her. Relatives who had gathered outside granted the officers access to the home. As the officers entered, one of them saw what appeared to be a bloody fingerprint on the screen door,[1] and the officers observed that the first floor of the house appeared to have been ransacked, with couch cushions on the floor and furniture drawers open.

After checking the first floor and the basement, the officers proceeded to the second floor, where they discovered the unclothed body of the victim face down on her bedroom floor covered in blood. Strewn about the victim were various items of bloody clothing, including her nylon stockings, girdle, and shoes. Underneath her body was her blood-soaked empty purse, blouse, bra, and a housecoat. Situated inside the folds of the housecoat was a kitchen knife encrusted in blood. The victim's bedspread was also saturated with blood, and a fitted bed sheet covering her mattress was heavily stained with a mixture of blood and semen.

Some of the responding officers present on the scene were approached by an individual who told them "he had heard that [Appellant] Tony Wright was the person responsible for the killing of Ms. Talley," and "he might be on Bott Street staying with a guy by the name of either St. Ives or St. James." N.T. Trial, 5/26/93, at 73. Subsequently, two officers and a detective went to a home at 3978 Bott Street where Roland Saint James ("St. James") resided, along with his roommate, John "Buddy" Richardson. N.T. Trial, 6/1/93, at 6, 20. This home was located about 300 feet from the victim's house. St. James admitted at trial that he rented rooms of this residence to others so they could smoke crack cocaine, and, also, that he would help others procure it from local dealers. *Id.* at 8, 34–37.

---

1. Crime scene investigators subsequently performed a fingerprint "lift" on this and other partial prints located on the frame of the storm door and its window, which were compared to Appellant's fingerprints, but no match was obtained. N.T. Trial, 5/26/93 at 109.

St. James was placed in handcuffs and taken to the police station by the officers, one of whom informed him that he was the "primary suspect." *Id.* at 57–58. After interrogation, St. James, who was wanted on an outstanding bench warrant, gave a statement, which was typed by detectives and later signed by him. In this statement, St. James alleged Appellant had told him that sometime on the night of Friday, October 10 he had "stabbed a woman." *Id.* at 69, 72, 75. After he gave his statement to the police, St. James was released. *Id.* at 60.

According to St. James' trial testimony, St. James claimed that Appellant, then age 20, arrived at his house on the afternoon of Friday, October 18 and repeatedly entered and left the residence all afternoon and evening, all the while using crack cocaine and spending time with various women who were on the premises. *Id.* at 7, 34, 42, 74. Appellant told him he was robbing drug dealers to get the money to pay for the crack and that he had an argument with his mother that evening. *Id.* at 19. He noticed Appellant wearing a white t-shirt with the word "Pennant" on it and that this t-shirt had a "little blood" on it, but also stated that Appellant did not have his shirt on for most of the night. *Id.* at 19, 47. Later in his testimony, St. James conceded that he might have told police at the time of his interrogation that Appellant was wearing gray sweat pants, white sneakers, and a light colored jacket. *Id.* at 49.

St. James, who admitted to heavily using crack himself during this time, testified further that: sometime late Friday night or early Saturday morning, between the hours of 12:00 a.m. and 1:00 a.m., he left the house with Appellant to buy additional crack, *id.* at 8–9; Appellant had told him he was moving from his mother's home and needed help in taking his television and radio out of the house in order to sell them, *id.* at 9–10; he accompanied Appellant to the victim's residence on Nice Street, whereupon Appellant told him he had to go in and get the television and radio, *id.* at 11; he did not want to go in to the house, so he left Appellant standing in front of the victim's house on the sidewalk, *id.* at 29; and Appellant

followed him back to his house, stayed a short time, and left again. *id.* at 17.

St. James also claimed that, later on Saturday morning, sometime before 2:00 a.m., Appellant arrived at his door with another individual known as "Earl," *id.* at 15; Earl was carrying a large portable television and Appellant was carrying a radio, *id.* at 16; St. James kept the items, averring that Appellant and Earl had asked him to hold them for sale until later that morning, *id.* at 14; St. James subsequently gave the television to another individual to be sold and put the radio in the trash, *id.* at 22, 56; several hours later, around 5:00 a.m., he received a bloody white t-shirt from his roommate, Richardson, who St. James says carried it downstairs to him, *id.* at 20–21; and St. James remembered that he "freaked out" at the sight of the bloody shirt. *id.* at 21.

The police took Richardson to the station in handcuffs for questioning on Saturday morning, and he remained there until 3:00 a.m. the following morning. *Id.* at 150. He was released after he gave a statement to police regarding his whereabouts and his interactions with Appellant on Friday night. *Id.* at 151. At trial, Richardson testified that, while he was out walking that night, he encountered Appellant, whom he claimed to have only briefly met twice before, at the intersection of Nice and Kerbaugh Streets, sometime after 8:00 p.m. Richardson stated that Appellant was alone and dressed in a red sweatshirt and carrying a white t-shirt rolled up in a ball.[2] *Id.* at 169–170. Richardson asserted that Appellant "asked me to go down the street on Nice Street and to be a look-out at a house because he said he had the keys to the house and that he wanted to go in there and get some T.V.s out." *Id.* at 144. According to Richardson, once Appellant pointed out the house, he refused to go along with Appellant's plan and tried to dissuade him because, in his words, he "knew the lady," and he did not "break in houses." *Id.* At this point, Richardson claimed Appellant told him, "look, well, I guess I have to go in

2. Richardson could not identify the t-shirt as the same one which he alleged to have found in St. James' house later that morning. *Id.* at 171.

there myself and if I go in there, if anything happen [sic] I'm going to have to kill her, you know." *Id.* at 145. Richardson professed to have left the scene at that point to go to a local bar and only returned to St. James' home around 6:00 a.m. to go to work. *Id.*

In regard to the t-shirt St. James claimed Richardson carried down the stairs, Richardson testified he found the shirt on his return to the house located on a counter top under a window in the dining room, and that St. James told him to put the shirt in a bag, take it down the street and put it into the trash since the garbage truck was coming. *Id.* at 148–49.

On the afternoon of Sunday, October 20 police went to Appellant's house, and they were granted admittance by Appellant's mother, Marilyn Martin. *Id.* at 15. According to Detective Santiago, they saw Appellant sitting on a couch and told him they were investigating the murder of the victim. Detective Santiago asked Appellant if he would accompany them to the Police Administration Building to be interviewed, and he agreed. Upon arrival, Detective Santiago took Appellant upstairs to the Homicide Division and told him that they would be charging him with the murder of the victim. *Id.* at 25. Thereafter, Detective Santiago read Appellant his Miranda rights, and he had Appellant write yes or no answers to written questions on a form relating to his understanding of those rights, as well as initialing each of his answers. *Id.* at 27. Santiago testified that Appellant then gave a statement, which was not recorded by audio or visual means but, instead, was typewritten by another detective.

According to this nine-page transcription, Appellant recounted the following series of events to the detectives: Appellant went to St. James' house on Friday night and then left there and met Richardson at the corner of Kerbaugh and Bott streets. He told Richardson that he needed money for drugs and was going to rob the victim and get it, but that he would have to kill her since she knew him. Richardson agreed to be a lookout and waited for him. Around midnight, Appellant went to the victim's house and knocked on her door. Once she answered, Appellant barged into her home and took her

upstairs to the second floor, pausing only to grab a kitchen knife from the kitchen. Upon reaching the second floor, Appellant asked her to remove her clothes so he could tie her up. When she began to struggle Appellant stabbed her; however, before stabbing her, he had sex with her on the floor of the bedroom, but he did not ejaculate. Appellant then became scared and fled from the house, but left the knife in the room. *Id.* at 34–39.

Richardson was waiting outside, and Appellant motioned for him to go to Bott Street. Appellant then met with him, St. James, and Earl at St. James' house and told them he "had to kill [the victim] because she knows me," after which all four decided to go back to her home and "get her stuff." *Id.* at 37. They removed a television and clock radio from the room and a little black purse and took the items back to St. James' house. Appellant spent the rest of the night at St. James' house. Appellant described the clothes he was wearing that evening as a black sweatshirt with "Chicago Bills [sic]," blue jeans with suede on them, and black FILA sneakers. *Id.* at 68. He informed the police that these items could be found in his bedroom at his home. *Id.*

Detective Santiago testified that Appellant, who had completed the tenth grade, read all nine pages and signed them. *Id.* at 40. Detective Santiago estimated that they were in the room with Appellant for not more than 1–1/2 to 2 hours, after which they placed Appellant under arrest and charged him with the homicide of the victim.[3] *Id.* at 39. He was the only individual charged with homicide in connection with her death. *Id.* at 42.

The police next obtained a search warrant for Appellant's home, which they executed on Sunday afternoon. Appellant's mother granted the officers entrance to the residence and, in response to their request, directed the officers to her son's bedroom on the second floor. *Id.* at 96. She remained downstairs as the officers conducted their search of Appellant's room. One of the detectives who participated in the

---

3. Appellant was additionally charged with, and tried for, the offenses of burglary, rape, robbery, and possession of instruments of crime.

search, Detective Frank Jastrzembski, testified that between the box spring and mattress of Appellant's bed they found, and took custody of, a black Chicago Bulls sweatshirt with white trim and a pair of blue jeans with a suede front. N.T. 6/2/93, at 98. The sweatshirt and jeans were both stained with blood, and the jeans also contained a seminal stain in the front zipper region. Additionally the police seized a pair of black FILA sneakers laying on the floor.

After being held for trial on all charges, Appellant filed a motion to suppress this evidence on the grounds his confession was involuntary and made as the result of physical and psychological coercion and deceitful police conduct, which he alleged occurred after he indicated he did not wish to speak with police. He also asserted that he did not receive Miranda warnings, nor did he understand any of the things the police wrote down or which he signed. A suppression hearing was held on December 16, 1992, before the Honorable Eugene H. Clarke, following which Judge Clarke denied the motion. Appellant's capital trial took place from May 26 through June 8, 1993. At trial, Appellant's confession was admitted into evidence against him and read to the jury.

In addition to the testimony of the witnesses as described above, the Commonwealth also presented at trial the testimony of two witnesses present on the street near the victim's home on the night of her murder, Greg Alston and Shawn Nixon. Alston, related that around 10:00 p.m. on the night of Friday, October 18 he and two other youths were sitting on the corner of Kerbaugh and Nice Streets. Alston testified he saw Appellant "pacing up and down the street" four times for about seven minutes with a man he identified as Richardson. N.T. Trial, 6/1/93 at 81, 83. Alston stated that he then observed Appellant knock on the door of the victim's home and go in while Richardson waited outside. *Id.* at 82. Alston's companion, Nixon, testified that he also recalled seeing Appellant walk up and down the street and go in the victim's house. However, Nixon specifically denied that it was Richardson, whom he knew, with Appellant. Rather he identified Appellant's companion as Earl. N.T. Trial, 6/2/93, at 75–76.

Assistant Medical Examiner Edwin Lieberman, who conducted the autopsy on the victim the morning of Sunday, October 20 testified that her death was caused by multiple stab wounds, coupled with blunt force injuries. *Id.* at 114. Because of the dimension of the wounds, and their depth of penetration, Dr. Lieberman opined that they were likely inflicted by a similar class of knife as the knife recovered from the folds of the victim's housecoat. *Id.* at 116–123.

Dr. Lieberman could not conclusively determine the time of the victim's death, and estimated that she died sometime within a time period of 36 hours before she was pronounced dead at 4:30 p.m. on Saturday, October 19. N.T. Trial, 6/2/93, at 112, 132. Dr. Lieberman additionally informed the jury that the results of acid phosphatase tests on swabs taken from the victim's vagina, rectum, and mouth during the autopsy were negative. He told the jury that the presence of acid phosphatase would indicate a "scenario of sexual activity," provided the male did not have a vasectomy or was not wearing a condom. *Id.* at 127.

The jury further heard testimony from criminalist Louis Brenner regarding the results of forensic testing he performed on pieces of evidence introduced at trial. Brenner conducted conventional ABO blood type testing [4] of the bloodstains on the knife found under the victim's bathrobe, the fitted sheet on her bed, and the sweatshirt and jeans which the detectives testified were taken from underneath Appellant's bed. He related that he found only the presence of the victim's blood type, type A, on all of these items. N.T. Trial, 6/3/93, at 30–33.

Brenner also subjected the semen stain found in the crotch area of the jeans to the same blood type testing. Brenner testified that Appellant had blood type O and was a secretor.[5]

4. The ABO blood typing system groups human blood into four well recognized basic blood types A, B, O, and AB which are named for specific antigens found in the cell membranes of red blood cells. 3 *Forensic Sciences* § 29.07[b] (Cyril H. Wecht ed., Lexis Nexis 2008) (hereinafter *"Forensic Sciences"*).

5. Approximately 75 percent of individuals in the total human population are considered secretors, which means, with the exception of those

N.T. Trial, 6/3/93, at 40–41. He could not, however, determine whether the victim was a secretor or non-secretor. *Id.* at 30, 42. Brenner told the jury that he found A and H antigens in the semen stain on the jeans and explained that the presence of the A antigen indicated that a type O secretor like Appellant could not have been solely responsible for the stain. *Id.* at 33–35. However, Brenner also informed the jury that a stain containing a mixture of fluids from an A secretor and an O secretor could also appear to have originated only from the individual with the A blood type, since both individuals produce the H antigen in their respective bodily fluids, but there is no O antigen in the bodily fluid of a secretor with type O blood. *Id.* Brenner indicated that it was therefore not possible using this testing method to determine if the stain on the jeans was from more than one person, or, if it was a mixed sample, to differentiate the various people who may have contributed to it. *Id.* at 85.

Brenner also related that he conducted early generation DNA testing, known as HLA–DQ, on these same bloodstains, and all were found to contain only the victim's specific genotype.[6] Brenner told the jury that this genotype was present

with blood type O, their specific blood type antigen can be found in large quantities in other bodily fluids, such as saliva, sweat, gastric juices and semen. The bodily fluids of all secretors, including those with blood type O, also contain a substance known as antigen H. Thus, bodily fluids, such as sperm, from a type O secretor will contain only antigen H, whereas the bodily fluids of secretors with type A blood will contain antigen A and antigen H, those with type B blood, antigen B and antigen H, and those with type AB blood, antigen AB and antigen H. The remaining twenty five percent of the population are classified as non-secretors, and their bodily fluids contain neither their blood type antigen nor the H antigen. *Forensic Sciences supra* at n. 5.

6. The fundamental scientific principles undergirding DNA tests were derived from the work of Nobel Prize-winning molecular biologists Watson and Crick, who famously determined that an intact human DNA molecule took the shape of a double helix, which resembles a twisted spring or spiral staircase consisting of two entwined strands, each containing the amino acids cytosine, guanine, thymine, and adenine, which are known as bases. These bases are situated in each strand in a linear fashion like linked cars of a train. The two strands are held together by bonds which form across the strands between each of the bases in the individual strands. These bonds obey certain biochemical rules; thus, adenine bonds only with thymine and cytosine

in only five percent of the population and further estimated the probability of finding this specific genotype in combination with type A blood in the African American population, of which the victim was a member, to be approximately 1.4 percent. *Id.* at 73. On cross-examination, he acknowledged that the test results could not definitively establish that the bloodstains came only from the victim. *Id.* at 85.

Brenner, however, admitted to not subjecting the seminal stains found on the sheet and the crotch area of the jeans to HLA–DQ testing. He indicated that his lab was having difficulty using then extant techniques to obtain genetic material from seminal stains for accurate testing. He expressed dissatisfaction with the results obtained from such testing efforts, and he did not deem them "consistently complete." *Id.* at 75–76. Hence, he did not want to test a seminal stain

with guanine. Once the two separate bases have bonded, they are referred to as base pairs. U.S. Dept. of Justice, *Principles of Forensic DNA for Officers of the Court* (2009), at 6–7, available at http://forensic. dna.gov.

In cells with nuclei such as skin, sperm, or white blood cells, the DNA is packaged within chromosomes located in the nucleus. Certain portions of the DNA material in chromosomes are called genes, and segments thereof are considered "coding" regions since they direct a cell's manufacture of proteins and, thus, they determine an individual's particular physical attributes and characteristics such as eye color, hair color and left or right-handedness. N.T. Trial, 6/3/93, at 50–55; John Butler, *Forensic DNA Typing* 22–23 (Elsevier 2d. ed. 2006). A gene also contains non-coding sequences of base pairs which do not directly control the manufacture of proteins, and other segments of base pairs in the chromosome between genes are non-coding as well. Both the non-coding portion of certain genes and other non-coding areas of chromosomes vary significantly between individuals, and, thus, are utilized as DNA markers for identity testing. The position on a chromosome where a particular DNA marker can be found is known as a locus. The form of DNA marker observed at each chromosomal locus examined in a DNA test is considered an allele. Since chromosomes occur in pairs, with one chromosome inherited from the mother and one from the father, there will be two alleles for a specific chromosomal locus, one derived from each parent. The designation of two alleles at a particular locus is referred to as a genotype. HLA–DQ testing focuses on only one specific locus on human chromosome number six. The base pair sequence at this locus has six known alleles, which can combine to form 21 separate genotypes. N.T. Trial, 6/3/93, at 56–61; Butler, at 22–23; Norah Rudin, Keith Inman, *An Introduction to Forensic DNA Analysis* 43, (CRC Press 2d ed.2002).

since he did not feel comfortable that this testing method would yield results which could be admissible as evidence. *Id.*

Appellant's mother testified on his behalf. She recalled that she was present during the search of her house by detectives and acknowledged directing them to her son's room. However, she averred that the detectives, after intensively searching the room, came back down the stairs carrying only a white jumpsuit, which she stated Appellant routinely wore to work, as well as pictures of his girlfriend and child, which he had hanging on his bedroom wall. *Id.* at 128–129. She claimed that she did not see the detectives remove a sweatshirt, jeans, or sneakers, and denied that her son ever owned such items *Id.* at 130.

Appellant testified in his own defense. He categorically denied killing the victim, sexually assaulting her, or taking things from her house. *Id.* at 145. He asserted he did not know St. James or Richardson or any of the other witnesses who testified, and he claimed to have never been in St. James' house. *Id.* at 146–148. Appellant related that on Friday, October 18 he went to work at 7:00 a.m. and came home around 5:00 or 5:30 p.m. *Id.* at 152. He recounted that, later that evening, around 11:30 p.m., he went with a friend to a local night club and remained there until 4:00 a.m., after which he returned home and went to bed. *Id.* He stated that on Saturday he awoke around 10:00 a.m., went shopping with some friends, and then, afterward, went with them to a concert at Cheyney University.

He recalled awaking at about 10:00 a.m. on Sunday and watching a football game on television when the detectives came to his house to question him. He remembered going to the station with them at their request, but averred that he had no knowledge they were investigating the victim's death until they told him. He testified he repeatedly denied killing the victim during a lengthy five hour interrogation, but he changed his mind and agreed to confess after the detectives threatened him with physical harm. *Id.* He recalls signing a number of sheets, which he did not read, at the detective's request. *Id.* at 161–162. Although he acknowledged that the

signature on the confession entered into evidence against him at trial was his, he claimed he never read the factual details of the confession until it was shown to him in preparation for trial. *Id.* at 164.

Appellant admitted to possessing a white jumpsuit, which he wore for work, but flatly denied owning the relevant sweatshirt, jeans, or shoes. *Id.* at 153, 164–165. He avowed the shoes could not have been his since his shoe size was 9–1/2 and the shoes admitted into evidence were size 11. *Id.* at 171. In addition, he professed to wearing a size 38 pants, which was two sizes larger than the jeans entered into evidence. *Id.* at 172.

After hearing all of the aforementioned testimony, the jury returned a verdict of guilty on all counts. Although the Commonwealth sought the death penalty, the jury could not unanimously agree on that punishment. As a result, the trial court imposed a sentence of life imprisonment.

On direct appeal, the Superior Court affirmed Appellant's judgment of sentence. He filed no petition for allowance of appeal to our Court. In August 1996, Appellant filed a *pro se* petition under the Post Conviction Relief Act ("PCRA"), 42 Pa.C.S.A. §§ 9541–46, raising three issues alleging trial counsel's ineffectiveness, which was denied, and this denial was upheld by the Superior Court. Our Court later denied Appellant's petition for allowance of appeal.

Thereafter, our legislature enacted Section 9543.1, which took effect on September 9, 2002. Appellant, represented *pro bono* by new counsel, Sondra Rodrigues, Esq., as well as attorneys from the Innocence Project of Brandeis University in New York, admitted *pro hac vice*, filed a motion under this statute on July 15, 2005, asserting that he was innocent of the rape and murder of the victim. Appellant requested a form of more advanced DNA testing known as Short Tandem Repeat ("STR") Analysis,[7] which he averred was not available for

7. STR Analysis determines the number of repeating sequences of two to five base pairs present at multiple chromosomal loci. Typically, at least 13 separate chromosomal loci are examined in standard STR Analysis, since this is the minimum number required for test results to be

forensic use until 1999. Contending such testing could demonstrate his actual innocence, Appellant requested the PCRA court grant him permission to test the semen and bloodstains found on the jeans, the fitted sheet taken from the victim's bed, the bloodstain on the sweatshirt, the handle of the kitchen knife, and the oral, vaginal, and rectal swabs taken during the victim's autopsy. Appellant asserted that testing of this evidence, which is preserved, had the potential to demonstrate that he was not the source of the perpetrator's DNA. He also alleged that, if tested, the results could be entered into national DNA databases for the purpose of finding the actual individual who committed the crimes.

The PCRA court, the Honorable D. Webster Keogh, denied Appellant's motion for testing on July 10, 2006. In his opinion in support of his order, Judge Keogh noted that Judge Clarke, in his previous ruling on Appellant's suppression motion, determined Appellant's confession was not coerced. Trial Court Opinion, 7/10/2006, at 4. Contrary to the PCRA court's statement in its opinion, Petitioner did not further raise the issue of the propriety of Judge Clarke's ruling in either his direct appeal, his prior PCRA petition, or his appeal from the denial of that petition. *See Commonwealth v. Wright,* No. 00487 Philadelphia 1994, unpublished memorandum at 1–2, 447 Pa.Super. 638, 668 A.2d 1200 (Pa.Super. filed August 14, 1995); *Commonwealth v. Wright,* No. 5228 Philadelphia 1997, unpublished memorandum at 7–9 (Pa.Super. filed Sept. 1, 1999) (enumerating and discussing issues). Because 42 Pa.C.S.A. § 9543.1(c)(3)(ii)(A) requires an applicant for DNA testing to "present a *prima facie* case demonstrating that the: ... DNA testing of the specific evidence, assuming exculpatory results, would establish: ... the applicant's actual innocence," Judge Keogh deemed Judge Clarke's finding that the confession was

included in CODIS ("Combined DNA Indexing System") the national DNA database maintained by the FBI. Because of the multiplicity of chromosomal loci used in this type of testing, and the fact that 8 to 20 alleles may potentially occur in the population for each chromosomal locus, it is statistically improbable for any two random individuals in the world, except identical twins, to share the same DNA profile obtained from this test. *Principles of Forensic DNA for Officers of the Court, supra* at n. 7, 54–58.

not coerced as precluding Appellant from making out a *prima facie* case, pursuant to the Superior Court decision in *Commonwealth v. Young*, 873 A.2d 720 (Pa.Super.2005) (ruling that an individual was not entitled to DNA testing under Section 9543.1 where he had confessed to the crime, and the confession was determined to be voluntary), discussed at greater length *infra*. Moreover, Judge Keogh also noted that, under Section 9543.1(d)(2)(i), a court "shall not order DNA testing if, after review of the record, the court determines there is no reasonable probability that testing would produce exculpatory evidence that would establish . . . actual innocence," and he determined that "[t]here is no such reasonable possibility in this case." Trial Court Opinion, 7/10/2006, at 6.

On appeal, the Superior Court, in a published decision, *Commonwealth v. Wright*, 935 A.2d 542 (Pa.Super.2007), also discussed *infra*, agreed *Young* was controlling and, as a result, affirmed Judge Keogh's denial of Appellant's petition. Appellant subsequently petitioned our Court for review, which we granted, solely limited to the question of whether a voluntary confession precluded an individual from establishing a *prima facie* case of his innocence in order to obtain DNA testing under Section 9543.1. *See Commonwealth v. Wright*, 597 Pa. 233, 951 A.2d 263 (2008) (order).

We note that the Commonwealth has candidly conceded in its brief to our Court that the Superior Court was wrong to adopt a *per se* rule barring a convicted defendant who gave a confession, subsequently deemed legally voluntary, from asserting actual innocence of the crime for which he or she was convicted in order to obtain DNA testing under Section 9543.1. *See* Commonwealth's Brief at 13. However, even though the parties agree on this essential point, we are obliged to conduct our own independent review of the decisions of the lower courts and, thus, for purposes of that review, we presently summarize Appellant's arguments raised in his brief to our Court.

Appellant argues that the fact that his suppression motion was decided adversely to him, and his confession ruled to be voluntary, does not preclude him from obtaining DNA testing

under Section 9543.1. He avers that the question of the admissibility of his confession as evidence has nothing to do with the question of whether he is entitled to utilize previously unavailable DNA testing in order to prove that the factual substance of the confession was false and that he did not rape or murder the victim. He points out that the rules barring the admission of involuntary confessions at trial are grounded in an individual's guarantee of due process under the Fifth and Fourteenth Amendments to the United States Constitution, and the United States Supreme Court has repeatedly held that the accuracy of the facts contained in the statements is irrelevant to the question of admissibility. *See* Appellant's Brief at 19 (citing, *inter alia, Lisenba v. California,* 314 U.S. 219, 236, 62 S.Ct. 280, 86 L.Ed. 166 (1941) ("The aim of the requirement of due process is not to exclude presumptively false evidence, but to prevent fundamental unfairness in the use of evidence whether true or false."); *Colorado v. Connelly,* 479 U.S. 157, 167, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986) (holding that, even though a statement given by an individual in the grip of schizophrenic hallucinations may be proved to be unreliable, unless the statement was the product of police coercion, it cannot be deemed involuntary and, thus, the due process clause of the Fourteenth Amendment does not prohibit the statement's admission into evidence)).

Appellant notes it is this dichotomy between the question of the voluntariness of a confession and the question of its veracity which provides the reason why a defendant in Pennsylvania under Pa.R.Crim.P. 581(J) [8] may dispute the underlying truthfulness of a confession at trial, even if the confession has previously been deemed admissible. Appellant points out that he did, in fact, challenge the truthfulness of his confession at his trial, and he repudiated it, claiming it was made out of

8. Rule of Criminal Procedure 581(J) provides:

If the court determines that the evidence shall not be suppressed, such determination shall be final, conclusive, and binding at trial, except upon a showing of evidence which was theretofore unavailable, but nothing herein shall prevent a defendant from opposing such evidence at trial upon any ground except its suppressibility. Pa.R.Crim.P. 581(J).

fear for his safety. Hence, Appellant contends the Superior Court erred in concluding that, because his confession was ruled admissible, it was also finally determinative of his guilt. By contrast, he maintains the DNA testing he sought would provide powerful evidence on this ultimate central factual question.

Appellant specifically cites and discusses three Pennsylvania cases—those of Bruce Godschalk, Nicholas Yarris and Barry Laughman—as illustrative of the danger of using a finally litigated ruling of a confession's voluntariness to bar subsequent DNA testing to prove actual innocence. Appellant contends that, in all three of these cases, innocent individuals gave confessions to police for crimes they did not commit and, even though DNA testing established that none of them had participated in the crimes for which they were convicted, their confessions all included distinct details of those crimes which had not been released to the public. Further, all of these individuals sought to have their confessions suppressed as either involuntary or violative of the Fifth Amendment right against self-incrimination and the Sixth Amendment right to the assistance of counsel. However, in each of the cases, the defendant's confession was deemed admissible by the trial court, and this finding of admissibility was upheld in post-conviction challenges. All three individuals were convicted after trials at which their confessions were used as a key piece of evidence against them, and their convictions were subsequently affirmed on appellate review. Appellant notes that it was only through the use of post-conviction DNA testing that these imprisoned individuals, one of whom was subject to a death sentence, were able to demonstrate their innocence of the crimes for which they had been convicted.[9] Appellant

9. Godschalk gave an audiotaped confession to two rapes in which he explicitly waived his Miranda rights. This confession was admitted as evidence at trial against him, despite his recantation of it, and he was convicted and sentenced to 10–20 years incarceration. Godschalk later sought DNA testing, but because his case arose before the enactment of Section 9543.1, he made his request under the PCRA with an assertion that his trial counsel was ineffective for failing to request such testing. The PCRA court denied the request, citing the fact that his confession was valid and admissible and, in its opinion, was "overwhelming

evidence of [his] guilt" since it contained details of the rapes which were not publicly available. *Id.* at 367 (citing *Commonwealth v. Godschalk*, 451 Pa.Super. 425, 679 A.2d 1295 (1996)). *Godschalk* subsequently sought DNA testing by filing an action under 42 U.S.C. § 1983 in the Eastern District of Pennsylvania. The District Court granted the requested testing despite what it viewed as overwhelming evidence, reasoning that he was entitled to testing as long as there was a chance, "no matter how remote," the testing could prove his innocence. *Id.* at 370. The testing ordered by the court subsequently showed the semen recovered from rape kits taken from the victims was not his, and he was released from prison.

Yarris was charged with abducting, raping, and murdering a woman who was returning from her job at a shopping mall. Yarris, who was in prison on an unrelated charge, made a number of incriminating statements to prison correction officials, police interrogators and a fellow inmate, indicating his involvement in aspects of the crime. These statements, which included details not revealed to the public about the victim's car, together with ABO blood testing evidence, and eyewitnesses accounts of Yarris' alleged stalking of the victim prior to her murder, furnished the basis for his conviction and a sentence of death. Our Court affirmed his conviction on appeal, finding, *inter alia*, that his motion to suppress statements given to detectives during interrogation—including one in which he admitted to raping but not murdering the victim—was properly denied since he had either volunteered the information to detectives without prompting, or had waived his Miranda rights prior to giving the statements. *Commonwealth v. Yarris*, 519 Pa. 571, 549 A.2d 513 (1988). Subsequent DNA testing on gloves found in the victim's car, semen stains on the victim's underpants, and fingernail scrapings were exculpatory and excluded Yarris as the source of the material. The test found the presence of two other DNA profiles from two different individuals. These test results caused all charges against Yarris to be dropped, followed by his release from death row. *Yarris v. County of Delaware*, 465 F.3d 129 (3d. Cir.2006).

Laughman was tried, convicted, and sentenced to life in prison for the rape, robbery, and murder of his 85–year–old aunt. The key piece of evidence against Laughman, who was mildly retarded, was a confession police officers obtained after an hour of interrogation. The confession, which was audiotaped, was recited by one of the investigating officers who then asked him if it was correct, and Laughman was heard on the tape to answer yes. Laughman sought to suppress the evidence, and, even though the trial court found that he had a low IQ and was unable to comprehend his written *Miranda* warnings, the court nevertheless rejected his contention that his confession was involuntary. The judgment of sentence was affirmed on direct appeal by both the Superior Court and our Court. Laughman thereafter filed a number of petitions under the PCRA, in order to obtain DNA testing of semen samples taken from the victim; however these efforts were unsuccessful. Following the enactment of Section 9543.1, the trial court allowed him to obtain DNA testing which excluded him as the source of the semen. The trial court subsequently dismissed the charges against him and released him from prison. *Laughman v. Pennsylvania*, 2007 WL 2345295 (M.D.Pa. filed August 16, 2007).

avers these three cases provide dramatic illustrations of what he terms "the fallacy" of the Superior Court's reasoning that confessions in and of themselves provide irrefutable evidence of guilt when their voluntariness has been finally litigated. Appellant's Brief at 36.

Appellant assails the Superior Court's interpretation of the text of Section 9543.1 as violative of the rules of statutory interpretation which require courts to refrain from adding provisions to statutes which the legislature has not included. He notes that nowhere in the plain meaning of the statutory text is there an express prohibition against DNA testing for individuals who have confessed, nor is there any indication from the statutory language that such a confession would automatically preclude a convicted individual from establishing a *prima facie* case of his or her innocence. Appellant notes that the statute does contain express restrictions barring a court's grant of DNA testing in certain situations such as where the technology existed for such testing at the time of trial and was not utilized. Appellant contends that, had the legislature wished to enact a prohibition in cases where a defendant has confessed, it could easily have done so; therefore, its omission must be viewed as deliberate and indicative of its intent not to bar defendants who have confessed from access to DNA testing to establish their actual innocence.

Appellant further observes that this section was passed in the aftermath of well-publicized exonerations by DNA testing of individuals who had confessed to crimes, especially that of Godschalk. He directs our attention to the remarks made by Senator Stewart Greenleaf, the Chairman of the Pennsylvania Senate Judiciary Committee, who conducted a hearing in 2001 on the subject of post conviction exonerations, and who was principal sponsor of this legislation, as evidence of the General Assembly's intent to facilitate broad access to post conviction DNA testing having the scientific potential to demonstrate actual innocence with its enactment of Section 9543.1.[10] Ap-

10. Senator Greenleaf gave the following remarks from the Senate floor on the occasion of the passage of Section 9543.1:

pellant contends that the Superior Court's interpretation in *Young* and the case at bar creates an artificial barrier to DNA testing in contravention of the legislature's intent.

Additionally, Appellant points out that, at present, 42 other states, the District of Columbia, and the federal government have enacted statutes providing for post conviction DNA testing, and none of those statutes expressly bars DNA testing in cases where there is a confession—even if it has been ruled voluntary. Appellant underscores the fact that the Superior Court decision in *Young* is a distinct anomaly in the body of jurisprudence interpreting the other state and federal DNA testing statutes, as it is the only decision to interpret a DNA testing statute to automatically exclude those who have voluntarily confessed from utilizing legislatively established procedures for obtaining testing.

Appellant argues that the categorical bar to DNA testing articulated by *Young* for defendants whose confessions were deemed voluntary would deny actually innocent individuals access to the DNA testing they could utilize to prove their claims of innocence. This, Appellant argues, would result in the "unjust and absurd" result of innocent individuals being wrongfully incarcerated for lengthy terms or, like Nicholas Yarris, subjected to potential execution. Appellant's Brief at

It is a bill that came out of the hearing of the Committee on Judiciary on the death penalty moratorium, and as we were going through that process, we found that Pennsylvania does not have easy access to DNA testing for those persons on death row or other crimes they are charged with to have access to that type of testing. This legislation would provide that testing and provide a payment process for it and a process in which an individual could easily present their case, and a judge could then decide whether they would be allowed to have the testing or not, and they would be allowed to have it if the evidence would prove their innocence, or if you are on death row to prove that they were innocent of the crime and/or that an aggravating circumstance was not justified ... [A]s we have seen in the press, there are occasions when DNA is used to convict an individual, and, of course, there are occasions when DNA can convincingly establish the innocence of an individual. And so we will now join 13 other States in this nation that will provide for this process and to make sure that we do not have anyone in our prisons or on death row who is innocent. Floor Statement of Senator Stewart Greenleaf, Senate Journal, 6/19/01, page 745.

46.[11] He maintains such consequences constitute "the quintessential miscarriage of justice." *Id.* at 46–47.[12]

After conducting our own independent review, we agree with the parties and conclude that the Superior Court erred in *Young* by announcing such a sweeping preclusion. Correspondingly, we hold that the reliance on *Young* by the Superior Court panel below necessitates reversal. For the reasons that follow, we expressly disavow *Young* and overrule the decision of the Superior Court in the present matter.

The pertinent statutory language at issue provides as follows:

### § 9543.1. Postconviction DNA testing

### (a) Motion.—

(1) An individual convicted of a criminal offense in a court of this Commonwealth and serving a term of imprisonment or awaiting execution because of a sentence of death may apply by making a written motion to the sentencing court for the performance of forensic DNA testing on specific evidence that is related to the investigation or prosecution that resulted in the judgment of conviction.

\* \* \*

11. To buttress his contention that existence of a confession, in and of itself, does not provide conclusive evidence of guilt, Appellant cites studies of reversals of convictions resulting from DNA testing, which he claims have shown innocent people have falsely confessed to crimes they did not commit. *See* Appellant's Brief at 24–26 (citing, *inter alia,* Garrett, Brandon L., *Judging Innocence,* 108 Colum. L.Rev. 55, 76 (2008); Garrett, Brandon L., *The Substance of False Confessions,* 62 Stanford Law Review 1051 (2010); Drizin and Leo, *False Confessions in the Post–DNA World,* 82 N.C.L.Rev. 891, 956 (2004)).

12. Appellant also contends that, by enacting Section 9543.1, the state has created a right to DNA testing for convicted defendants to establish their actual innocence and that he also has a recognized right under the Sixth Amendment to the United States Constitution to present a defense that a third party committed the crime for which he has been accused no matter how inculpatory the evidence against him appears. He asserts that the Superior Court's construction of Section 9543.1 in *Young* impedes both rights. Appellant's Brief at 50–53. Since our decision today is grounded on principles of statutory interpretation, we need not address these claims.

**(c) Requirements.**—In any motion under subsection (a), under penalty of perjury, the applicant shall:

\*　　\*　　\*

(3) present a *prima facie* case demonstrating that the:

(i) identity of or the participation in the crime by the perpetrator was at issue in the proceedings that resulted in the applicant's conviction and sentencing; and

(ii) DNA testing of the specific evidence, assuming exculpatory results, would establish:

(A) the applicant's actual innocence of the offense for which the applicant was convicted;

42 Pa.C.S.A. § 9543.1.[13]

We begin our discussion by reviewing the rationale employed by the Superior Court in *Young* and in the case *sub judice* in construing these statutory provisions. In *Young*, the appellant, a juvenile, was convicted of the crimes of second-degree murder, robbery, and other offenses for the stabbing of his next door neighbor, whose bloodied body was found laying against her kitchen door. In addition to the eyewitness testimony of the decedent's young son, who saw Young threaten his mother in her bedroom while brandishing a knife and later fleeing from the premises, the trial evidence included a knife, shoes, pants and a washcloth containing human blood recovered from Young's house. Young also gave a full confession to the crime to police, but the Commonwealth did not introduce this confession into evidence at trial.

In Young's direct appeal to the Superior Court and our Court, he never challenged the voluntariness of his confession. However, in subsequent PCHA[14] proceedings, he argued that the trial court erred in admitting the physical evidence against him since it was "the fruit of the poisonous tree" of his involuntary confession. This claim was rejected by the trial

13. With respect to the requirements of subsection (c)(3)(i), the parties herein do not dispute that the identity of the perpetrator of the rape and murder of the victim was the central issue in Appellant's trial.

14. Post Conviction Hearing Act, 42 Pa.C.S.A. §§ 9541–9551 (repealed), the predecessor to the PCRA.

court and that decision was affirmed on appeal by the Superior Court.

Young next filed a petition under Section 9543.1, requesting DNA testing on the items of physical evidence taken from his home, which the trial court denied. The PCRA court reasoned that neither the identity of the perpetrator of the crime, nor the question of Young's actual innocence, was at issue at any time before, during, or after trial. The PCRA court based its conclusion on the fact that, in his PCHA appeal, the Superior Court concluded his confession was voluntary, as well as the victim's son's observation of Young menacing his mother with the knife shortly before her death, and the physical evidence of the blood stained items found in Young's house. The PCRA court concluded all of these factors constituted "overwhelming indicia of guilt," which left "virtually no doubt as to the identity of the perpetrator." *Young*, 873 A.2d at 726.

A panel of the Superior Court, in an opinion authored by Judge Hudock, and joined by Judges Montemuro and Kelly, rejected the PCRA court's finding that identity was never at issue. The panel noted that Young's trial attorney engaged in extensive cross-examination of the Commonwealth's witnesses in order to dispute both their identification of Young and the other evidence linking him to the crimes, as well as argued to the jury that the son's identification took place only after the police and district attorney improperly suggested to him that Appellant murdered his mother. The panel additionally observed that the blood evidence taken from the home was never identified as the same blood type as the victim, as the PCRA court had inaccurately found.

Nevertheless, despite these erroneous factual conclusions, the panel agreed with the PCRA court that Young could not meet the *prima facie* requirements of Section 9543.1 for DNA testing. The panel acknowledged Young's claim of innocence in his Section 9543.1 petition but found his confession to the murder barred him from asserting a claim of actual innocence since "the validity of the confession [was] finally litigated, found not to be coerced, and was knowingly and voluntarily given." *Young*, 873 A.2d at 727 (citing *Commonwealth v.*

*Starr*, 541 Pa. 564, 574, 664 A.2d 1326, 1331 (1995)). The panel also noted, in dicta, that, even if the confession did not preclude Young from seeking DNA testing under Section 9543.1, he was not entitled to relief, because any exculpatory results arising from the DNA testing would not be enough to establish Young's actual innocence of the murder given the eyewitness testimony of the victim's son.

In the instant case, the Superior Court panel opinion, authored by Judge Panella and joined by Judge Popovich,[15] specifically relied on *Young* to affirm Judge Keogh's denial of Appellant's petition. The panel ruled Appellant's failure to appeal the ruling of the suppression court that his confession was knowing and voluntary caused that ruling to become "the law of the case." *Wright*, 935 A.2d at 547. Consequently, it reasoned that, because the confession was "finally litigated, found not to be coerced, and was knowingly and voluntarily given ...[,] this case is directly controlled by *Young* and [Appellant] is unable to assert his actual innocence." *Id.* The panel did not address the trial court's alternative finding that there was no reasonable possibility that DNA testing would produce exculpatory evidence establishing Appellant's actual innocence of the crimes for which he was convicted.

In considering the propriety of these rulings, we are guided by our well established standard of review of an order denying post-conviction relief. Our task is to examine whether the lower court's rulings are supported by the evidence of record as well as whether they are free from legal error. *Commonwealth v. Morales*, 549 Pa. 400, 408, 701 A.2d 516, 520 (1997). To resolve the question of whether a confession, the voluntariness of which has been fully and finally litigated in prior proceedings, precludes a convicted person from subsequently presenting a *prima facie* case that exculpatory results obtained from DNA testing of items of evidence would establish his or her actual innocence, requires us to interpret the relevant language of Section 9543.1. Because statutory interpretation is a matter of law, our standard of review is *de novo,*

---

**15.** Judge Joyce heard oral argument in the case but did not participate in the final decision.

and our scope of review is plenary. *Commonwealth v. McClintic*, 589 Pa. 465, 472, 909 A.2d 1241, 1245 (2006). Consequently, we are not bound by the lower court's conclusions regarding the proper meaning of the applicable provisions of this statute. *See Commonwealth v. Kyle*, 582 Pa. 624, 632, 874 A.2d 12, 17 (2005) (holding that our Court owes no duty of deference to the legal conclusions of lower courts regarding an issue of statutory construction).

Our review is further governed by the Statutory Construction Act, 1 Pa.C.S.A. § 1501 *et seq.*, under which our paramount interpretative task is to give effect to the intent of our General Assembly in enacting the particular legislation under review. *See* 1 Pa.C.S.A. § 1921(a) ("The object of all interpretation and construction of statutes is to ascertain and effectuate the intention of the General Assembly. Every statute shall be construed, if possible, to give effect to all its provisions."); *Nationwide Ins. Co. v. Schneider*, 599 Pa. 131, 143, 960 A.2d 442, 448 (2008). Generally, the best indication of the General Assembly's intent may be found in the plain language of the statute. *Martin v. Commonwealth, Dep't of Transp., Bureau of Driver Licensing*, 588 Pa. 429, 438, 905 A.2d 438, 443 (2006). In this regard, "it is not for the courts to add, by interpretation, to a statute, a requirement which the legislature did not see fit to include." *Commonwealth v. Rieck Investment Corp.*, 419 Pa. 52, 59–60, 213 A.2d 277, 282 (1965). Consequently, "[a]s a matter of statutory interpretation, although one is admonished to listen attentively to what a statute says[;][o]ne must also listen attentively to what it does not say." *Kmonk–Sullivan v. State Farm Mut. Auto. Ins. Co.*, 567 Pa. 514, 525, 788 A.2d 955, 962 (2001) (internal quotations omitted).

Applying these principles to the case before us, the plain language of subsections (c)(3)(i) and (c)(3)(ii)(A), read together, establishes two basic requirements a convicted individual requesting DNA testing, who also meets the requirements set forth in Section 9543.1(a), is obliged to establish in his or her written motion: 1) a *prima facie* case demonstrating that identity of the perpetrator of the crime was at issue at trial,

and 2) a *prima facie* case that DNA testing of the specific evidence identified in the motion, assuming it yields exculpatory results, would establish his or her actual innocence of the crime for which he or she was convicted. Nowhere in subsections (c)(3)(i) or (c)(3)(ii)(A), or in any of the other provisions of Section 9543.1, did the legislature include an explicit prohibition to prevent a convicted individual who has confessed to a crime, and who otherwise meets all of the statutory requirements, from obtaining DNA testing, merely because of the existence of the confession. Neither do we perceive any reasonable reading of the entirety of the text of Section 9543.1 which would impliedly support such a restrictive construction. Consequently, absent any such express or implicit direction by the legislature, it was improper for the Superior Court to judicially engraft such a barrier to DNA testing into this statute.

The critical flaw in the Superior Court's reasoning in *Young*, and in its decision in the present matter, was its legal conclusion that a finally litigated ruling on the voluntariness of a confession was also fully and completely determinative of the factual accuracy of the confession and, thus, dispositive of the issue of actual guilt or innocence. This was improper since the issue of the voluntariness of a confession—i.e. whether it was obtained in a manner which did not violate the due process rights of the defendant under the United States and Pennsylvania Constitutions—is entirely separate from the issue of whether a defendant's admissions in the confession conclusively establish, factually, that he or she committed the acts which form the basis for his or her conviction. As these are two separate and distinct questions, the resolution of each involves fundamentally different considerations.

When a court is called upon to determine whether a confession is voluntary and, hence, admissible at trial, it examines the totality of the circumstances surrounding the confession to ascertain whether it is "the product of an essentially free and unconstrained choice by its maker." *Schneckloth v. Bustamonte,* 412 U.S. 218, 225, 93 S.Ct. 2041, 36

L.Ed.2d 854 (1973). In making this inquiry, a court is not concerned with the issue of whether the substance of the confession is true. *See Rogers v. Richmond*, 365 U.S. 534, 544, 81 S.Ct. 735, 5 L.Ed.2d 760 (1961) (expressly disapproving of judging the admissibility of a confession under the United States Constitution by utilizing a standard which considers the probable truth or falsity of the confession and instead emphasizing that the question of admissibility is "a question to be answered with complete disregard of whether or not [the defendant] in fact spoke the truth."); *Jackson v. Denno*, 378 U.S. 368, 377, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964) (holding the determination of the voluntariness of a confession is "a determination uninfluenced by the truth or falsity of the confession."); *Commonwealth v. Bracey*, 501 Pa. 356, 365, 461 A.2d 775, 779 (1983) (holding that question of whether a confession was coerced was not to be resolved by considering the truth or falsity of the confession). Rather, a court is constrained to examine only whether an individual's confession was the product of coercion, duress, or the use of other measures by interrogators deliberately calculated to overcome his or her free will. *See Culombe v. Connecticut*, 367 U.S. 568, 602, 81 S.Ct. 1860, 6 L.Ed.2d 1037 (1961) ("[I]f [a defendant's] will has been overborne and his capacity for self-determination critically impaired, the use of his confession offends due process."); *Colorado v. Connelly*, 479 U.S. at 164, 107 S.Ct. 515 ("Absent police conduct causally related to the confession, there is simply no basis for concluding that any state actor has deprived a criminal defendant of due process of law.").

Conversely, the question of the veracity of the factual matters contained in a confession, and their bearing on the substantive issue of the defendant's guilt or innocence, is an entirely separate inquiry altogether. As our Court cautioned five decades ago: "[A] confession of the commission of a crime is not sufficient, in and of itself, to convict. . . . We need not be reminded of the countless situations where persons confess to crimes of which they are innocent, either out of a desire to cover up for the guilty person or because of a psychological

urge to do so." *Commonwealth v. Conklin*, 399 Pa. 512, 514–515, 160 A.2d 566, 568 (1960). Our Court's observation of the reality of this curious aspect of human behavior has not lost its force of truth with the intervening passage of time.[16]

Further, even if a confession has properly been admitted into evidence at trial, a finder of fact is still not compelled to believe the matters contained in the confession

16. Amicus, the American Psychological Association ("APA"), contends in its brief there have been many historical instances when innocent people volunteered confessions to crimes they did not commit, including the nearly 200 people who came forward to say that they kidnapped Charles Lindbergh's baby, and the more recent well-publicized confession of John Mark Karr to the murder of JonBenet Ramsey. Amicus Brief for APA at 8. The APA enumerates a variety of reasons why innocent people might voluntarily confess, such as an individual's desire for media attention or public notoriety, guilty feelings or delusions of involvement, a belief that they will benefit by the act of confession, or the confessor is motivated by a desire to protect a parent, child, or someone else. *Id.*

Relying on the results of various research studies, the APA identifies two factors it believes to be primary reasons for false confessions resulting from the interrogation process. The first factor it cites is interrogation tactics which can lead innocent people to confess in order to end the interrogation process. According to the APA, such tactics can involve: (a) isolating and cutting off the person being interrogated from his or her support structure of family and friends and then confronting the person with strong accusations of guilt which the interrogator claims are supported with evidence, even though some of this evidence may not even exist, resulting in strong feelings of despair; (b) wearing the interrogated person down with lengthy interrogations; (c) the interrogator pretending to minimize the severity of the offense and to provide sympathy or moral justification for the questioned individual's actions; and (d) the interrogator suggesting to the individual that he or she would be treated with leniency if he or she confesses.

The second factor the APA discusses in its brief is the vulnerability of certain groups of people to interrogation, particularly juveniles or intellectually impaired individuals, because those individuals do not comprehend what they are confessing to or even the nature of the questions being asked of them. *Id.* at 8–15 (citing, *inter alia*, Inbau, *Criminal Interrogation and Confessions* (Jones and Bartlett, 3d. ed. 2001)); Ofshe and Leo, *The Decision to Confess Falsely: Rational Choice and Irrational Action*, 74 Den. U.L.Rev. 979 (1997); Zulawski and Wicklander, *Practical Aspects of Interview and Interrogation* (CRC Press 1993); Leo, R. *Inside the Interrogation Room*, 86 J.Crim.L. and Criminology 266 (Winter 1996); Leo and Ofshe, *The Consequences of False Confessions: Deprivations of Liberty and Miscarriages of Justice in the Age of Psychological Interrogation*, 88 J.Crim.L. and Criminology 266 (Winter 1998).

and to automatically return a verdict of guilty, since the confession is not decisive of the issue of the defendant's guilt or innocence. *See Crane v. Kentucky*, 476 U.S. 683, 689, 106 S.Ct. 2142, 90 L.Ed.2d 636 (1986) ("Confessions, even those that have been found to be voluntary, are not conclusive of guilt. And, as with any other part of the prosecutor's case, a confession may be shown to be 'insufficiently corroborated or otherwise unworthy of belief.' "). The finder of fact remains the final arbiter of the question of the veracity of the matters contained in the confession and is wholly free to decide its impact, if any, on the central question of the defendant's guilt or innocence.[17] *Commonwealth v. Ewell*, 456 Pa. 589, 593, 319 A.2d 153, 156 (1974) ("A defendant's voluntary out-of-court statement is merely another piece of evidence to be considered in resolving the ultimate issue of guilt or innocence, and jurors can attach as much or as little weight to it as they see fit."). Ultimately, the finder of fact is free to choose to believe all, part, or none of the contents of a confession in arriving at its verdict. *Commonwealth v. Sherwood*, 603 Pa. 92, 109, 982 A.2d 483, 493 (2009) ("[A] jury or a trial Court can believe all or a part of or none of a defendant's statements, confessions or testimony."); *Commonwealth v. Williams*, 197 Pa.Super. 184, 176 A.2d 911, 918 (1962) ("[A] jury is not *required* to accept a confession as true even if it is voluntarily made." (emphasis original)).

 The Superior Court was, therefore, in error to hold that a finally litigated ruling that a confession was

17. The standard jury instructions trial judges across this Commonwealth frequently utilize to instruct juries on their deliberations further illustrate the clear distinction between the question of the voluntariness of a confession, and the question of whether the confession is truthful and determinative of guilt. Juries are explicitly instructed to consider both questions separately. *See, e.g.,* Pennsylvania Suggested Standard Jury Instruction § 3.04 (instructing the jury that they are not to consider a defendant's statement unless they find the defendant made the statement voluntarily) and § 3.05 (instructing the jury that once they have determined a defendant has made a statement voluntarily they may then consider the statement as evidence and consider the circumstances of its making, as well as all the other evidence in the case, to judge its truthfulness and how much weight it has on the question of the defendant's guilt).

uncoerced and, hence, voluntary, should also be treated as a final determination as to the truth of that confession and, thus, decisive of the convicted individual's guilt. The "law of the case" doctrine which we discussed in *Starr, supra,* and which was relied on by the Superior Court in *Young* as the basis for its holding, does not compel such a conclusion. In *Starr,* we emphasized that, under the law of the case doctrine, "a court involved in the later phases of a litigated matter should not reopen questions decided by another judge of that same court or by a higher court in the earlier phases of the matter." *Starr,* 541 Pa. at 574, 664 A.2d at 1331. However, this doctrine applies only when a court is later asked to consider the **same** question decided by another court of equivalent or higher jurisdiction. *In re De Facto Condemnation and Taking of Lands of WBF Associates, L.P. ex rel. Lehigh–Northampton Airport Authority,* 588 Pa. 242, 268, 903 A.2d 1192, 1207 (2006). Because, as we have discussed, the question of the voluntariness of a defendant's confession and the question of the defendant's actual guilt or innocence are fundamentally different issues, a finally litigated ruling that a confession has been given knowingly and voluntarily is not binding on courts in subsequent phases of the case considering the wholly separate question of whether DNA testing may establish an individual's actual innocence, the confession notwithstanding. Consequently, we hereby disapprove *Young,* and we reverse the panel decision below. We now hold that a confession, in and of itself, is not a *per se* bar under Section 9543.1(c)(3) to a convicted individual establishing a *prima facie* case that DNA testing would establish actual innocence of the crime for which he or she was convicted, even if the voluntariness of that confession has been fully and finally litigated.

As noted previously, the PCRA court indicated in its opinion in support of its dismissal of Appellant's motion that, under *Young,* it considered the previous ruling that Appellant's confession was voluntary as barring, as a categorical matter, Appellant from establishing a *prima facie* case for DNA testing. Thus, it did not consider whether Appellant's specific factual allegations in his motion for DNA testing established a

*prima facie* case of his innocence of the rape and murder of the victim. It is therefore necessary to remand this case to the PCRA court so that it may consider this question in the first instance.[18]

Additionally, as mentioned above, the PCRA court concluded its opinion by stating there was no reasonable possibility that Appellant's requested DNA testing would produce exculpatory evidence establishing his actual innocence, as required by Section 9543.1(d)(2)(i).[19] The following represents the entirety of the PCRA Court's rationale for this conclusion:

> Petitioner fails to present a *prima facie* case demonstrating that DNA testing would establish his actual innocence of the [offenses] for which he was convicted. Pursuant to 42 Pa.C.S. § 9543.1(d)(2)(i), this Court shall not order DNA testing if, after review of the record, the court determines there is no reasonable possibility that testing would produce exculpatory evidence that would establish the Petitioner's actual innocence of the offense for which he was convicted. There is no such reasonable possibility in this case.

Trial Court Opinion, 7/10/06, at 5–6. It appears, then, that the PCRA Court may have considered the *per se* bar of *Young* to Appellant's establishment of a *prima facie* case of his innocence as also operating to prevent him from demonstrating a reasonable possibility of his innocence under Section 9543.1(d)(2)(i). The Superior Court panel below did not address this issue in its opinion, having relied on *Young* to

---

**18.** As noted above, *see supra* note 13, the parties do not dispute that the identity of the perpetrator was at issue at trial, since Appellant repeatedly asserted at trial he was not the person who raped and murdered the victim or otherwise participated in any of the crimes which were committed that evening.

**19.** This subsection provides:

> **(d) Order—**
>
> &ast; &ast; &ast;
>
> (2) The court shall not order the testing requested in a motion under subsection (a) if, after review of the record of the applicant's trial, the court determines that there is **no reasonable possibility** that the testing would produce exculpatory evidence that:
>
> (i) would establish the applicant's actual innocence of the offense for which the applicant was convicted;

42 Pa.C.S.A. § 9543.1(d) (emphasis supplied).

conclude that Appellant was precluded by his confession from establishing a *prima facie* case that DNA testing would establish his actual innocence. Consequently, because the lower courts did not adequately address the question of whether Appellant met the requirements of Section 9543.1(d)(2)(i), and in light of our present holding that a confession is not a *per se* bar to a convicted individual's ability to seek DNA testing to prove his or her actual innocence, the PCRA court is to consider this question, anew, upon remand.

Order reversed. Case remanded to the Superior Court for remand to the PCRA court. Jurisdiction relinquished.

Former Justice GREENSPAN did not participate in the decision of this case.

Chief Justice CASTILLE and Justices SAYLOR, BAER and McCAFFERY join the opinion.

Chief Justice CASTILLE files a concurring opinion.

Justice EAKIN files a concurring and dissenting opinion.

Chief Justice CASTILLE, concurring.

I join Madame Justice Todd's Majority Opinion in its entirety. I write separately only to express the following point.

In summarizing appellant's arguments, the Majority notes the reliance upon secondary sources regarding exonerations across the nation and, specifically, three Pennsylvania state prosecutions involving defendants named Godschalk, Yarris, and Laughman. Majority Op. at 40–41, 14 A.3d at 809–10 & n. 9. The Majority sets forth both appellant's arguments and the federal decisions in those cases in a descriptive manner, without purporting to endorse the descriptions, which I believe is the proper course. I have no difficulty with the notion of false confessions, or with the reality that there are persons who have confessed, and have been convicted, who were actually innocent. In addition, of course, I see the wisdom in a statute that allows for DNA testing on collateral attack, to support a claim of actual innocence. I am wary, however, of accepting at face value characterizations of cases as represent-

ing determinations of "actual innocence" or "exoneration" when no such judicial finding has been made. Moreover, I am cognizant of the litigation incentive at work, both in defense advocacy and in the persons and organizations providing supporting studies and literature, to exaggerate the significance of what are usually judicial determinations that fall short of a finding of "actual innocence." A grant of a new trial, like a subsequent prosecutorial determination not to reprosecute, does not necessarily represent a determination of actual innocence.[1]

Justice EAKIN, concurring and dissenting.

We granted allocatur to clarify the holding in *Commonwealth v. Young*, 873 A.2d 720 (Pa.Super.2005), and address whether a voluntary confession precludes a *prima facie* finding that exculpatory results from DNA testing would establish actual innocence, as required under 42 Pa.C.S. § 9543.1. *See Commonwealth v. Wright*, 597 Pa. 233, 951 A.2d 263 (2008). I join the majority's holding insofar as it disapproves *Young*, which held "an appellant cannot assert a claim of actual innocence where ... the validity of the confession has been finally litigated, found not to be coerced, and was knowingly and voluntarily given." *Young*, at 727 (citation omitted). I also join the majority's holding:

> a confession, in and of itself, is not a *per se* bar under [§ ] 9543.1(c)(3) to a convicted individual establishing a *prima facie* case that the DNA testing being requested would establish actual innocence of the crime for which he or she was convicted, even if the voluntariness of that confession has been fully and finally litigated.

Majority Op., at 53, 14 A.3d at 817. I dissent because I would affirm the Superior Court on an alternative basis.

1. There is authority suggesting that many anti-death penalty studies promoting "exonerations" or "actual innocence" include in their numbers cases where defendants were acquitted, prosecutors chose not to re-try, some reversible error occurred, or some other type of legal insufficiency led to the defendant's release. These defendants were not, however, necessarily declared actually innocent. *See generally* Ward A. Campbell, *Exoneration Inflation: Justice Scalia's Concurrence in Kansas v. Marsh*, IACJ Journal, Summer 2008, at 49–63.

A confession is just one aspect of the measure of evidence which may preclude a finding of innocence under 42 Pa.C.S. § 9543.1. While it is not a *per se* bar to establishing innocence, a confession which has been deemed voluntary may lend itself to such a conclusion. The circumstances surrounding the confession may also contribute to the measure of evidence sufficient to overcome § 9543.1's innocence requirement. A confession is, after all, just a piece of the evidentiary record. *See Commonwealth v. Young*, 767 A.2d 1072, 1077 (Pa.Super.2001) (Eakin, J., dissenting). The measure of evidence precluding an actual finding of innocence should be determined by an evaluation of the totality of the circumstances, the test which guides most criminal procedure determinations.[1]

Appellant confessed to raping, robbing, and murdering the victim, as well as burglarizing her home. In this statement, Appellant noted he was wearing a black Chicago Bulls sweatshirt, a pair of blue jeans, and Fila sneakers. Police recovered these items from Appellant's home. Tests revealed the sweatshirt and jeans were splattered with the victim's blood. The jeans also had a stain on the crotch, which appeared consistent with a combination of Appellant's seminal fluid and the victim's bodily fluids; however, the source of the fluid

1. *See, e.g., Commonwealth v. Housman*, 604 Pa. 596, 986 A.2d 822, 840–41 (2009) (applying totality of circumstances in determining confession's voluntariness); *Commonwealth v. Patton*, 604 Pa. 307, 985 A.2d 1283, 1288 n. 3 (2009) ("we do not favor per se rules in error review"); *Commonwealth v. Allshouse*, 604 Pa. 61, 985 A.2d 847, 871 (2009) (Baer, J., concurring) (applying totality of circumstances in determining whether statement elicited at custodial interrogation); *Commonwealth v. Sherwood*, 603 Pa. 92, 982 A.2d 483, 501 n. 29 (2009) (determining probable cause); *Commonwealth v. Spotz*, 587 Pa. 1, 896 A.2d 1191, 1211–14 (2006) (determining whether prosecution used peremptory challenges to exclude women); *Commonwealth v. Davido*, 582 Pa. 52, 868 A.2d 431, 438–39 (2005) (determining whether defendant invoked right to self-representation); *Commonwealth v. Flanagan*, 578 Pa. 587, 854 A.2d 489, 500–04 (2004) (determining plea's validity); *Commonwealth v. Reid*, 571 Pa. 1, 811 A.2d 530, 545–46 (2002) (determining voluntariness of consent to search); *In re D.M.*, 566 Pa. 445, 781 A.2d 1161, 1163–64 (2001) (determining reasonable suspicion); *Commonwealth v. Fisher*, 564 Pa. 505, 769 A.2d 1116, 1127–28 (2001) (determining independent basis for identification).

could not be conclusively identified because of the limitations of DNA testing in 1991.

Appellant filed a motion to suppress his statement, but the suppression court concluded it was knowing and voluntary. At trial, the Commonwealth presented Appellant's confession, DNA evidence establishing the victim's blood was found on the jeans in Appellant's possession, eyewitness testimony from two people who saw Appellant enter the victim's home the night of the murder, and testimony from two witnesses to whom Appellant made inculpatory statements. Notwithstanding its misplaced reliance on *Young,* the Superior Court suggested the evidence was overwhelming. I agree.

This is not a case where the evidence Appellant seeks to have tested will point to the actual killer. The stain on Appellant's jeans, regardless of origin, cannot show Appellant did not rape and murder the victim; DNA evidence establishing the stain was not Appellant's would not demonstrate his actual innocence. As Chief Justice Roberts indicated in *District Attorney's Office for The Third Jud. Dist. v. Osborne,* 557 U.S. 52, 129 S.Ct. 2308, 2316, 174 L.Ed.2d 38 (2009), "DNA testing alone does not always resolve a case. Where there is enough other incriminating evidence and an explanation for the DNA result, science alone cannot prove a prisoner innocent." *Id.* (citation omitted). Appellant has been found guilty. "[O]nce a defendant has been afforded a fair trial and convicted of the offense for which he was charged, the presumption of innocence disappears." *Id.,* at 2320 (citation omitted). Appellant's access to DNA testing is not without its limits, and here, the evidence precludes the finding of innocence required by the statute.

Accordingly, I would not remand for further proceedings, but would affirm the denial of relief.